FILED

June 12, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____lad_____
DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

CHRISTOPHER E. WIMBERLY, §
§
    Plaintiff/Petitioner, §
§
v. § CIVIL ACTION NO. **6:23-cv-00455**
§ _____
LARRY LUMPKIN, TDCJ-DIRECTOR, §
§
    Defendant/Respondent. §

### PETITIONER'S MOTION TO REOPEN THE EVIDENCE WITH
### MEMORANDUM IN SUPPORT PURSUANT TO RULE 60(b)(6)

COMES NOW Christopher E. Wimberly, petitioner, and moves the Court to grant his request to reopen the evidence, pursuant to Rule 60(b)(6), and show the Court as follows:

### I.

### Introduction

The Petitioner is Christopher E. Wimberly, and Defendant is Larry Lumkin, Director of Texas Department of Criminal Justice. The Petitioner sue defendant for the violation of his Due Process and Equal Protection Rights under the United States Constitution.

The Petitioner seek to reopen his 2003 judgment by filing the motion under Fed.R. Civ.P. 60(b)(6): **Lijeberg v. Health Servs. Acquisition Corp.,** 486 U.S. 847, 863-64 (1988); **Thompson v. Bell,** 580 F.3d 423, 442 (6th Cir. 2009), cert denied, 131 S.Ct. 102 (2010); **Cmty Dental Servs. v. Tani,** 282 F.3d 1164, 1168 (9th Cir. 2009). This judgment is manifestly unjust because of these below factors constituted the "extraordinary circumstances" required to justify reopening the 2003 judgment under the Rule.

1.    The State of Texas Courts did not appoint counsel in the initial-review

of Petitioner ineffective assistance of counsel claim, thereby, denying peti-
tioner a meaningful opportunity to press his ineffective assistance in a
postconviction proceeding. Petitioner argues that had **Martinez** and **Trevino** been
decided before petitioner filed his §2254 petition, a federal court could
have reviewed a competent ineffective assistance claim. **Martinez v. Ryan,** 566
U.S. 1. 132 S.Ct. 1309 (2012); **Trevino v. Thaler,** 569 U.S. ____ , 133 S.Ct.
1911, 185 L.Ed.2d 1044 (2013).

**2.** Petitioner arguing that the prosecution violated the Equal Protection
and Due Process Clauses by withhold critical impeachment evidence that con-
flicted with the State's Case-in-Chief and trial theory of identification
not being an issue. See **Exhibit 1, 2 and 3.**

Prosecution had two eyewitnesses statement that **was** not tendered to
Defense Counsel during discovery. These witnesses was not call to testify,
nor included in the photo line-up process, mainly because their eyewitness
statements conflicted with the identification of the Petitioner. **See Exhibit 1,**
**and 2.** The Prosecution's decision to treat him differently, by withholding
critical evidence needed to impeach identification trial testimony, justify re-
lieving Petitioner of the State Court's adverse judgment.

**3.** The Sixth Amendment right to counsel is the right to the effective
assistance of counsel. Petitioner trial lawyer failure to investigate all evi-
dence tending to show his client innocent, was not constitutional responsi-
bility, and fail outside the wide range of professional competent assistance.

Defense Counsel Jon Jon McDurmitt, ineffectiveness originate from his
mistake of law. Counsel believed the defense was only entitle to evidence:

> "The State is only required to provide the defense a copy of a wit-
> ness statement when that witness is called as a witness and does
> testify. As the two people (Aida Rodriquez and David Sawchak) named
> in your letter were not called as state witnesses and did not testi-
> ty, I (Att. McDurmitt) do not have nor can I get a copy of their
> statements."

**See Exhibit 1.**                    -2-

**4.**    Defense Counsel McDurmitt, due inpart to his ineffectiveness. Did not know that Due Process also requires disclosure of any evidence that provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the witnesses, or to bolster the defense case against prosecutorial attacks. **Kyles v. Whitley,** 514 U.S. 419, 442n. 134, 445-451 (1965). See **Exhibit 1 and 2; Rodriguez and Sawchak-Statements.**

**5.**    However, Attorney Jon Jon McDurmitt could not recall such valuable evidence the Ida Rodriguez and David Sawchak witness   statement   provided, nor did he have copys in his files. See **Exhibit 1 and 2.**

**6.**    The statement of Ida Rodriguez and David Sawchak, so conflicted with the State's identification of Petitioner. Where Rodriguez gave the robber the money.  A reasonable Defense Counsel wouldn't pass on the opportunity to  present this eyewitness statement to the jury. Especially, where Sawchak said the robber was  around 5'9" to 5'11" and Rodriguez stated the robber was chuncky. The Petitioner was 6'3" and slim,  and  the  defense  theory  centered on size of the perpetrator! **See all at Exhibit 1 and 2.**

**7.**    Defense Counsel did not demand Brady Material in a motion, because counsel didn't understand the law concerning his clients rights. The United States Supreme  Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either  to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. **Brady v. Maryland,** 373 U.S. 83 (1963); **Strickler v. Greene,** 527 U.S. 263 (1999). This  case presented no physical, or medical or forensic evidence. Identification was the sole issue. See **Exhibit 4 and 5.**

**8.**    Defense Counsel determined that Petitioner was not entitle to a "Identi-

fication Expert," because the State didn't call an expert. However, newly discovered evidence shows that had Counsel called a defense identification expert. The identification expert would have testified and established that prosecution identification procedures readily produced a misidentification of the Petitioner. See **Exhibit 6, "Eyewitness Identification Expert Report"** by **Professor Nancy K.** Steblay, Ph.D.- **based on the Trial Testimony;** See Also, **Wimberly v. State,** No. 03-05-00726-CR (Tex.App.-Austin, Oct. 13, 2005 -LEXIS 8441.

**9.** Contrary to other belief, Petitioner has long believed that the Bell County Assistant District Attorney Paul R. McWilliams was withholding evidence. Petitioner based his belief on the fact that He didn't commit this crime. In a affidavit presented July 12, 2007, McWilliams stated he maintained an 'open file' policy and the defense attorney Jon McDurmitt had access to all docucumentary evidence for inspection and, where feasible, duplication. See **Exhibit 3.**

**10.** The McWilliams unlawful practice of withholding evidence came to light in a 2009 robbery trial of George Powell, the Texas Supreme Court proved that Assistant District Attorney Paul and Leslie McWilliams labored to keep information from the defense team that might have proven Powell innocent. They also promoted perjury in Demetric Smith's testimony.... Unlawful misconduct was a part of their modus operandi. They wanted a conviction by any means necessary, i.e. Withholding evidence or using perjured evidence?? See **Exhibit 3.**

**11.** On 2/13/2014, Petitioner received the Affidavit of Royry Glenn Tones, confessing to committing the Aff. Robbery of the Pizza Hut on December 23, 2002. See **Exhibit at 7.**

**12.** On September, 19, 2019, Petitioner received Affidavit of Trial Juror Randy Lee Sterling, who stated that, "had I been presented with this informa-

-4-

tion at Mr. Wimberly's trial, I would NOT have voted for his conviction." See **Exhibit 8 - Affidavit of Juror Randy Lee Sterling.**

Petitioner has introduce 12 factors that would justify the reopening his judgment under Federal Rule of Civil Procedure 60 (b)(6). Rule 60(b) enumerates specific, and extraordinary circumstances in which Petitioner may be relieved of the effect of his judgment, such as ineffective assistance of counsel, mistake, newly discovered evidence, and so fore. See **Gonzalez,** 545 U.S., at 535, 125 S.Ct. 2641.

The trial of this case began on October 20, 2003.

Petitioner presented his evidence and closed on Oct. 21, 2003, and was sentence on November 24, 2003.

Petitioner now asks the Honorable Court to reopen the evidence.

## II.

### Arguments

The Court should reopen the evidence when the movant has a bona fide explanation for not offering the evidence earlier, the evidence is probative, and reopening the evidence will not cause undue prejudice. **Blinzler v. Marriott Int'l, Inc.,** 81 F.3d 1148, 1160 (1st. Cir. 1996). The Court has wide discretion to reopen the evidence. **Zenith Radio Corp. v. Hazeltine Research, Inc.,** 401 U.S. 321, 331 (1971).

In this case, the Court should reopen the evidence for the above extraordinary circumstances.

The evidence that Petitioner seeks to introduce is decisive, relevant, admissible, technically adequate, and helpful to the

-5-

fact-finder. **United States v. Parker,**,  73  F.3d 48, 53 (5th Cir. 1996), reh'g granted 80  F.3d  1042  (5th  Cir. 1996), reinstated in relevant part,  104 F.3d 72 (5th Cir. 1997).

**Extraordinary Circumstances:**

**A.**   Appellate Counsel Nikki Mundkowsky raised on Direct Appeals, ineffective assistance of trial counsel for failure to call an expert on identification. However, the Third Court of Appeals determined  the  record  was  insufficient  to  discern whether the failure was reasonable trial strategy?

On September 28, 2020, petitioner obtain the assistance of an Eyewitness Identification Expert, to review ALL Identification Documents, Trial Transcripts and Witnesses Testimony and provide a Scientific Analysis in writing. And  be prepared for open Court, under oath testimony. See **Exhibit 6.**

Appellate  Counsel  Mundkowsky  was ineffective for failing to develope the record on appeal, and failing to raise Due Process violation where she learn of suppression of the evidence by the prosecution. Suppression of evidence favorable to the accused was itself sufficient to amount to a denial of due process. **SEE Brady v. Maryland,** 373 U.S. 83 (1963); **Martimez v. Ruan,** 566 U.S. 1, 132 S.Ct. 1309 (2012); **Trevion v. Thaler**, 133 S.Ct. 1911, 185 L.Ed 2d 1044 (2013).

**B.**   The  prosecution withheld Incident Reports of David Sawchak, and Ida Rodriguez,  both eyewitnesses to the crime. Ms. Rodriguez was the cashier who gave the money to the robber!   This crucial evidence was  withheld  by prosecution with an eye to diminishing

-6-

petitioner ability to present a defense on misidentification. The petitioners assert's that, in so doing, prosecution infringed upon his Due Process Rights under the Fourteenth Amendment. $\mathcal{S}_{\mathcal{C}_{\cdot,}}$ Moreover, the prosecution excluded Sawchak and Rodriguez from participating in the photo-line up. See **Exhibit 2.**Mr. Sawchak viewed a line-up in <u>June 19, 2015</u>. He didn't pick Mr. Wimberly. The Supreme Court held in **Brady**, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. **supra,** 373 U.S. at 87: **Giglio v. United States**, 405 U.S. 150 (1972).

**C.** Petitioner asserts that it was objectively unreasonable for trial counsel not to investigate or interview all eyewitnesses to the crime. Counsel relied solely on the Prosecution to provide him with evidence to defend his client at trial.. Based in part on Counsel declaration on March 4, 2007. See **Exhibit 1.** Had Attorney Jon McDurmitt performed an independent investigation, he would have learn that Ada Rodriguez pasted the money to the robber, and stated; "he was chuncky." David Sawchak was cutting pizzas, when the robber came in, he stated; "the man had a beard and was about 5'7 to 5'9" tall..."

If it was Counsel trial strategy to distinguish his clients being 6'3 tall, failure to interview Rodriguez and Sawchak was ineffective.

Attorney Jon McDurmitt belief that if prosecution didn't

-7-

call Rodriguez or Sawchak to testify. Defense was not entitled to their testimoy before the jury. Attorney McDurmitt failed to invoke his "subpoena power" was ineffective, because counsel has equal subpoena power as the prosecution. See, **Gomez v. Beto**, 462 F.2d 596, 597 (5th Cir. 1972).

Moreover, in June 2015, Petitioner presented David Sawchak with a photo line-up of Mr. Wimberly (petitioner), and Mr. Sawchak a eyewitness pick someone else (Royry Glennm Tones) as the preson that committed the crime. See **Exhibit 2 and 7, attached.**

**D.**    In Feb. 2014, Petitioner received a affidavit from Royry Genn Tones, where he confessed to committing the crime at Pizza Hut on December 2003. See, **Exhibit 7.**

**E.**    In August 2019, Blackfish Investigation, Daryl Parker, Investigator presented Royry Glenn Tones affidavit to Randy Sterling, a juror seated on Petitioner jury. Mr. Sterling, after reading the affidavit of Mr. Tones, stated, "had I been presented with this information at Mr. Wimberly's trial, I would NOT have voted for his conviction." See, **Exhibit at 8.**

**The above** extraordinary circumstances evidence is not duplicative. The Defendant made no finding on Petitioner newly discovered evidence, but denied on procedure grounds. Apparently determined that Petitioner proof of additional evidence was deficiency to cure a Ineffective Assistance of Counsel or Due Process claim of Brady Violation.

### III.

### CONCLUSION

The extraodinary circumstates in Petitioner case is no physical, medical or forensic evidence that identified the robber of this crime. The facts shows that Mr. Wimberly (Petitioner) was 6'3" tall. The States witness statements was mixed:

Thomas Bales-black man 6'1"-couldn't ID at trial

Jared Castro- black man (dark)-Couldn't ID at trial

Ada Rodriguez-chunky black male-could not see face

Phillip Wynn-black male-all dark clothing with hood pulled over his head-early 30s, six feet tall, dark eyes, and could not see hair due to hood-could recognize him again

**NOTE: Mr. Wynn couldn't testify to facial hair.**

David Sawchak-black man in a dark jacket-beard, 5'7" to 5'9", and 25 to 30 year old

Gerard Gioioso-black man with a black coat and hood-6' feet tall, about 200 pounds, beard and mustache, about 35 years old

Mr. Wynn-revised his statement later-BM mustacle and beard-had not shaved for a week-6 feet tall-200 pounds-in early 30s

The jury was entitled to hear Rodriguez and Sawchak's statement, in that it conflicted with Wynn and Gioioso. At the very least, Petitioner would've received a complete review of the States witnesses statement, instead of what represented the State's View of the robber.

For these reasons Petitioner asks the Court to reopen the evidence and allow additional proof.

EXECUTED ___7___ day of June, 2023.

Respectfully submitted,

*Christopher E. Wimberly*

Christopher E. Wimberly
#1207400-ML(048)
3001 S. Emily Dr.
Beeville, TX 78102

-9-

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

CHRISTOPHER E. WIMBERLY,          §
                                  §
        Plaintiff/Petitioner,     §
                                  §
v.                                §    **CIVIL ACTION NO**_____
                                  §
LARRY LUMPKIN, TDCJ-DIRECTOR,     §
                                  §
        Defendant/Respondent.     §

### ORDER ON PETITIONER'S MOTION TO REOPEN THE EVIDENCE

After considering Petitioner/Plaintiff Christopher E. Wimberly's motion to reopen the evidence and the response, Petitioner/Plaintiff is requesting a hearing; and after a hearing, the Honorable Court;

GRANTS the motion ___

DENIES the motion ___

SIGNED AND EXECUTED on_____, 20___.


_____
U.S. DISTRICT JUDGE

# EXHIBIT

## [ 1 ]

Letter dated February 22, 2007, from Attorney JON JON MCDURMITT, concerning witness Rodriguez and David Sawchak Statements.

Letter dated March 09, 2007, from Attorney NIKKI MUNDKOWSKY.

Statement of Ada Rodriguez

Statement of David Sawchak

## JON JON MCDURMITT
### Attorney at Law
### P.O. Box 855
### Belton, Texas 76513

**Telephone: 254-913-1866**          **Office Visit by Appointment**          **Fax: 254-947-8057**

March 4, 2007

Christopher Wimberly
TDCJ #1207400
McConnell Unit
3001 South Emily Dr.
Beeville TX  7810

Dear Mr. Wimberly:

In response to your letter dated February 22, 2007.

The State is only required to provide the defense a copy of a witness statement when that witness is called as a witness and does testify.  As the two people named in your letter were not called as state witnesses and did not testify, I do not have nor can I get a copy of their statements.

Respectfully,

Jon J. McDurmitt
JJM/jmm

# Nikki Mundkowsky

**Attorney at Law**
208 E. Central, Suite 105
Belton, Texas 76513
*(telephone)* 254-933-9609
*(fax)* 254-933-1800
*email:* nmundkowsky@earthlink.net

March 9, 2007

Mr. Wimberly
TDCJ #1207400
McConnell Unit
3001 S. Emily Drive
Beeville, TX 78102

RE:    *State of Texas vs Christopher Eugene Wimberly*

Dear Mr. Wimberly:

In response to your letter, the statements made from David Sawchak and Aida Ridriguez was in State's record but it was not admitted into evidence therefore it was not entered in the appellate record.

Should you have any questions or concerns regarding this matter, you may contact us at the above address.

Sincerely,

Shantel Aguilar
Legal Assistant for Nikki Mundkowsky

# Killeen Police Department
## Voluntary Statement - (Not under Arrest)

**THE STATE OF TEXAS**  TIME: _11:30_ _P_.M.

**COUNTY OF BELL** KPD Case # _02-15946_ OFFICER: _Frias #72_

Before me, the undersigned authority in and for said County and State, on the _23_ day of _December_ 20 _02_, personally appeared

Name _Aida Rodriguez_ Race: _H_ ; Sex: _F_ ; Ht: _5'2_ ; Wt: _115_ ; Hair: _Brow_ Eyes: _Brown_
D.O.B. _09-01-78_ S.S.N _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_ ; DL/ID #: _TX DL # 03641150_ ; State: _TX_ ;
Home Address; _810 S Amy Ln #33 Harker Hights_ ; Phone No: _(254) 338-1148_ ;
Work Address: _2503 F Pancrea_ , _____ ; Phone No: _(254) 526-6888_ ;

**WHO VOLUNTARILY MAKES THE FOLLOWING STATEMENT:**

I was counting ~~my m~~ the store money
to make a deposit. When Jerry told me
to give him the money. we are being robbed.
The black male wearing all dark came
and he had a shot gun. I put the
mmey on the side counter and when he
Picked up the money. And took af.
I couldn't see his face he was chuncky.

_Aida Rodriez_
**SIGNATURE**

K.P.D.-65A-01

# Killeen Police Department
## Voluntary Statement - (Not under Arrest)

**THE STATE OF TEXAS**  TIME: _11:31_ _P_ .M.

**COUNTY OF BELL**  KPD Case # _02 - 01576_  OFFICER: _Frias # 23_

Before me, the undersigned authority in and for said County and State, on the _23_ day of _December_ 20__, personally appeared

Name _David Sawchak_ ; Race: _W_ ; Sex: _M_ ; Ht: _5'6"_ ; Wt: _190_ ; Hair: _BR_ ; Eyes: _BL_ ;
D.O.B.: _01/26/73_ ; S.S.N. _450 - 59 - 5959_ ; DL/ID #: _15780403_ ; State: _TX_ ;
Home Address: _2201 Wheeler Cir_ , _Killeen Tx 76549_ ; Phone No: (254) _526 - 4967_ ;
Work Address: _2003 E. Rancier_ , _Killeen TX 76549_ ; Phone No: (254) _526 - 6888_ ;

**WHO VOLUNTARILY MAKES THE FOLLOWING STATEMENT:**

At 10:45pm my store manager came to the front of the store where I was cutting pizzas and told us we were bieng robbed. A black man in a thick black jacket w/h with a shotgun came to the front behind my manager and said give me the money, then they gave him th money and he said to get down and went back c the back door. the man had a beard and was abou 5'7 to 5'9 tall and looked to be about 25-30 and he was very calm and in control.

_[signature]_
**SIGNATURE**

K.P.D.-65A-01

# EXHIBIT

## [ 2 ]

DICK GULLEDGE INVESTIGATIONS REPORT

AND

PHOTO LINE-UP for

DAVID SAWCHAK



**DICK GULLEDGE**
**iNVESTIGATIONS**

DONNIE MANRY, CHIEF INVESTIGATOR
P.O. BOX 10764
COLLEGE STATION, TEXAS 77842-0764
Donnie Manry - manry@txcyber.com
Dick Gulledge - dgi@suddenlink.net

CELL PHONE (979) 229-8932
TELEPHONE (979) 680-9326
TOLL FREE (800) 850-5247
FAX (979) 823-5629

June 19, 2015

Mr. Richard Wetzel
Attorney at Law
1411 West Avenue, suite 100
Austin, Texas 78701

Re: Wimberly, Christopher

Dear Mr. Wetzel,

Upon receiving this case from your office, including Tones affidavit, I attempted to locate the original witnesses who provided an ID to Police during the original investigation. I was able to locate Gerard "Jerry" Gioioso, however it was determined that Phillip Wynn appears to be deceased since 12-23-2007. This is according to multiple databases available to me, and the Social Security Death index master file. Since Mr. Wynn was no longer available, I attempted to contact other witnesses from the original offense in an effort to see if they might remember anything about the suspect's description.

Having received the two original booking photos of Tones and Wimberly, it was my intent to put together two separate photo lineups with each. After spending a significant amount of time on this effort, I was unable to complete two standard lineups with the resources available to me from public data sources. I placed one other random booking photo matching the general description from Sawchak's statement with the photos of Tones and Wimberly.

Mr. Gioioso was contacted and reviewed photos from this case. (See Gioioso report) Mr. Sawchak was contacted, because a review of his original statement provided some suspect description. Sawchak was never asked to identify the suspect by the Police during the original offense. Sawchak was provided photos to review in this case. (See Sawchak report) Thomas J Bales, aka TJ, was contacted. Bales could not provide any description other than a black male. Numerous phone messages were left for Jared Castro, however none were returned. Aida Rodriguez was not contacted, because her original statement indicates that she did not see the suspect's face.

I will be mailing you a copy of all reports and photographs used in this case. In addition, I will send you an electronic copy. Please let me know if there's anything else I can do for you in this case. As always, it is a pleasure working with your office. Thank you!

Respectfully submitted,

Donnie Manry

## Richard Wetzel

| | |
|---|---|
| **From:** | "Richard Wetzel" <wetzel_law@1411west.com> |
| **Date:** | Tuesday, April 21, 2015 10:29 AM |
| **To:** | "Donnie Manry" <manry@txcyber.com> |
| **Attach:** | WR-64,017-05 WRIT RECEIVED WRIT 1-28-2015.pdf; Wimberly Notes.docx; Witness Statements - Wimberly.pdf; Offense Report - Wimberly.pdf; Mug Shot - Royry Tones. 3-3-03.pdf; Mug Shot - Christopher Wimberly. 1.9.03.pdf; 03-726-CR sta's exh 12.pdf; Cause No. 54,824 -Indictment, Judgement, Offense Report.pdf; Cause No. 54,832 - Indictment, Judgment, Offense Report.pdf |
| **Subject:** | Christopher Wimberly |

Donny -

Thank you for visiting with me this morning about Mr. Wimberly's case. As I mentioned, he was convicted of committing an aggravated robbery at a Pizza Hut in Bell County on December 22, 2002. He received a sentence of 50 years.

He now claims he is actually innocent and relies on the affidavit of another inmate, Royry Tones, who claims he committed the aggravated robbery and not Wimberly. Tones is serving two 75 year sentences for robbing two Subway sandwich shops in Bell County during the same period of time. Tones affidavit of February 13, 2014, stating he is responsible for Wimberly's robbery is at page 34 of the WR-64,017 document.

The Wimberly Notes document has my notes from the litigation history, trial testimony, witness statements, and offense report on the Pizza robbery. Note the way the identification witnesses folded the six pack picture to only show the suspect's eyes when viewing the photos and making their identification.

The witness statements from the robbery are attached. The two witness who identified Wimberly and we are now looking for are Phillip Wynn and Gerard Gioioso.

The offense report from the Pizza robbery is attached.

Tones mug shot from his March 3, 2003, arrest is attached as well as Wimberly's mugshot of January 9, 2003 (note the mugshot states 2009 and that is an error, it was 2003).

The photospread shown to the witness is attached. Wimberly is middle top.

4/23/2015

Finally, I am attaching the two offense reports for the two robberies for which Tones was convicted.

I'm sure this is more than you need.  As I mentioned, I would like for you to locate and interview Wynn and Gioioso and see if Tones' picture rings a bell with them.  I also want to be sure Tones was not in jail at the time of the robbery on December 22, 2002.

Thanks a lot.


Richard E. Wetzel
Attorney at Law

1411 West Avenue, Suite 100
Austin, Texas
78701

phone - (512)469-7943
Fax - (512)474-5594

e-mail - wetzel_law@1411west.com



**DICK GULLEDGE**
INVESTIGATIONS

DONNIE MANRY, CHIEF INVESTIGATOR
P.O. BOX 10764
COLLEGE STATION, TEXAS 77842-0764
Donnie Manry - manry@txcyber.com
Dick Gulledge - dgi@suddenlink.net

CELL PHONE (979) 229-8932
TELEPHONE (979) 680-9326
TOLL FREE (800) 850-5247
FAX (979) 823-5629

June 12, 2015

Mr. David Sawchak
3671A, W. 11ᵗʰ st.
Odessa, Texas 79763

Re: Pizza Hut Robbery, December 2002

Dear Mr. Sawchak,

Per our earlier conversation, I have enclosed 3 photographs for your review. These individuals may or may not have had anything to do with the Robbery in question. Please call me when you receive these photos so that we may discuss them together. My cell number is 979-229-8932

Respectfully submitted,

Donnie Manry

# 06152015-Wetzel-Wimberly-Manry-Gioioso-int

## Witness:

Gioioso, Gerard aka "Jerry"
1709 Wilshire drive
Killeen, Texas 76543
254-368-4571

Pizza hut, Manager
2503 E Rancier
Killeen, Texas

Date of Interview:  061115, in person at 2503 E. Rancier

Can testify to:

On June 3, 2015, I contacted Jerry Gioioso by phone in reference to this case. I identified myself and explained that I was working at the direction of Attorney Wetzel to investigate new information that had arisen in this case. I explained to Jerry that there had been new information indicating that another person might have committed the robbery in this case. I asked Jerry if we could meet and discuss the robbery, and if he could look at some photographs. A meeting date was set for June 11, 2015 at the Pizza Hut, 2503 E. Rancier, Killeen, Texas. On June 11, 2015, I drove to Killeen, TX and met with Jerry at the Pizza Hut to discuss this case.

Jerry said that on the night of the robbery he had been sitting at his desk with his back toward the rear door of the business. He said that he heard Phillip Wynn walk out the back door heading to make a delivery. Jerry said he then heard the door open and Phillip come back inside. As he turned to look, he saw Phillip walking back inside, and a b/m behind Phillip with a shotgun in Phillip's back. The b/m ordered them both to the front of the store and walked behind Phillip and Jerry. Jerry said that once at the front of the store the b/m was given the money at which time he turned and fled out the rear door and into a field behind the business. Jerry said he didn't get a good luck at the b/m because he only saw him for a second when he came in the back door, and that Phillip was between he and the b/m. Jerry said that the b/m also kept his head down the entire time. Jerry's also stated the b/m was wearing a hoodie. Jerry said he remembered the b/m had a "raggedy" old shotgun that was short. Jerry reiterated that he didn't get a good look at the b/m at the time. I told Jerry that the Police report indicated that he looked at multiple photo lineups, and had selected one photo with an 80% certainty rate. Jerry said, "back then, under those circumstances, I might have been 80% sure", but again said he only saw the b/m for a second. I asked Jerry if he felt that his ID at the time of the offense was sufficient to convict a person of that robbery. Jerry said "absolutely not, absolutely not".

I then asked Jerry if he would mind looking at some photos. I presented Jerry with three individual photos. The photos were booking photos of Royry Tones from 2003, a booking photo

of Christopher Wimberly from 2003, and a third random booking photo of a Broderick Parnell. I explained that the individuals in the photos may/may not have any involvement in the Robbery in question, but asked Jerry if any of those photos looked familiar to him. Jerry inspected each photo individually and all three simultaneously. Jerry stated that none of the persons in the photos looked familiar to him. Jerry did not favor one photo over another, or spend more time on one photo than another. He viewed them all equally before saying that he didn't recognize anyone in the photos. Jerry reiterated that he did not get a good luck at the b/m.

# 06152015-Wetzel-Wimberly-Manry-Sawchak-int

## Witness:

Sawchak, David
w/m, 01/26/73
3671 A W. 11th St.
Odessa,Tx 79763
432-288-4624
432-288-4740

Date of Interview:  060415, phone

Can testify to:

On above date I contacted Sawchak in reference to this case. I contacted Sawchak after reviewing his original witness statement, which provided a basic description of the suspect in this case.  Upon contacting Sawchak I asked him if he could tell me what he remembered about the robbery.

Sawchak said that at the time of the robbery he was standing by the oven cutting a pizza, with an unobstructed view of the back door. Sawchak said he saw the driver (Wynn) come in the back door, and saw a b/m behind the driver with a shotgun. He said the shotgun was short, like it was sawed off or had a pistol grip. Sawchak said the b/m had a stocky build, but that he couldn't remember his facial features or his clothing description. Sawchak said that the b/m might have been wearing a mask, but he couldn't remember because he was intentionally avoiding looking at the b/m in the face. He described the b/m as confident and that he acted as if he knew what he was doing, and knew the layout of the store. Sawchak said they were counting money at the time, and the b/m came straight to the area of the safe and demanded the money. Sawchak said the b/m said "I don't want to hurt anybody, just give me the money."

Although Sawchak made the previous statements to this investigator about not recognizing any facial features of the suspect, he later stated that he thought he remembered the suspect being a light skinned b/m, with short hair, facial hair, and possibly freckles. He further stated that he thought he could identify a photo of the suspect. On June 12,2015 I mailed a packet to Sawchak containing booking photos of Royry Tones (#2), Christopher Wimberly (#3), and third random photo of an individual named Broderick Parnell (#1). On 6-15-15 I contacted Sawchak; however he had not received the packet at that time. I instructed Sawchak to contact me as soon as he received the packet.

On June 18, 2015 I received a call from David Sawchak advising that he had received the packet containing the photos. I again explained that the photos may or may not have any involvement in this case, that I understood there had been a great deal of time that had passed, and that I certainly didn't want him to guess at any photo id. But, that I did want to give him an

opportunity to look at the photos since he had indicated he could possibly identify the suspect from a photo. I asked him if he saw anyone in the photos that he recognized.

Sawchak said he had looked at the photos. He quickly said "I have a really really strong feeling about Number 2. He has the look I remember, his eyes are right, the facial hair is right, and he has the look on his face that I remember." (photo #2 was Royry Tones)  Sawchak stated that photo #3 was too clean cut to be the suspect, it definitely wasn't #3. (#3 was Christopher Wimberly). Sawchak stated that he looked at photo #1, but #1 was bigger than the suspect. (#1 was Broderick Parnell) Sawchak went on to say that even if he had more photos; he would still pick #2, that was the guy he remembered. Sawchak said he couldn't be 100% certain, only because of the amount of time that had passed. I asked Sawchak what percentage of certainty he would place on the photo. He stated 50% certain, and reiterated only because of the amount of time since the original offense. 〽













# EXHIBIT

## [ 3 ]

AFFIDAVIT OF ASSISTANT DISTRICT ATTORNEY

PAUL R. MCWILLIAMS

NEWPAPER ARTICLE REBUTTAL OF AFFIDAVIT CLAIMS



## No. 54,705-C

| EX PARTE | * | IN THE 264TH JUDICIAL |
|---|---|---|
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| CHRISTOPHER WIMBERLY | * | BELL COUNTY, TEXAS |

### *Affidavit*

*State of Texas*     *
*County of Bell*     *

Before me the undersigned authority, personally appeared **Paul R. McWilliams**, who,

after being by me duly sworn, deposed as follows:

1      "My name is Paul R. McWilliams. I am over the age of 21 years, of sound mind and body,

2    capable of making this affidavit, and personally acquainted with the facts herein stated.

3      "I am an attorney, licensed to practice law in the State of Texas, and for the past several years

4    have been employed as an Assistant District Attorney in the Bell County District Attorney's Office in

5    Belton, Texas. My primary duty consists of representing the State in felony cases originating in this

6    jurisdiction.

7      "I have been advised by the Appellate Division of our office that Christopher Eugene Wimberly,

8    the defendant in Cause Number 54,705, has filed a post-conviction Writ of Habeas Corpus alleging, inter

9    alia, prosecutorial misconduct. In essence, Mr. Wimberly claims that the State 'suppressed' two

10   exculpatory witness statements from the defense. Since I was the lead prosecutor in his case, I have been

11   asked to respond to his allegation.



12

**COPY**

1    "In April of 2003, our office indicted two cases in which Mr. Wimberly was the suspect:  Cause

2    Number 54,704, a Robbery, and the instant case, Cause Number 54,705, an Aggravated Robbery.  I was

3    assigned the prosecution of both cases.  After they were indicted, Jon McDurmitt, a local attorney, was

4    appointed to represent Mr. Wimberly.  Throughout his representation of the defendant, I maintained an

5    'open file' policy with regard to the defendant's cases.  Basically, that meant that Mr. McDurmitt had

6    access to all physical and documentary evidence in the State's possession for inspection and, where

7    feasible, duplication.  In addition, the State agreed to timely supplement its file when necessary.

8        "The specific statements referenced by the defendant, those of Aida Rodriguez and David

9    Sawchak, have always been in the State's file and available for Mr. McDurmitt's review.  I would

10   disagree with the defendant's claim that the statements were somehow 'exculpatory,' but his opinion

11   aside, I categorically deny that they were ever 'hidden' from the defense.  In fact, I maintained my open

12   file policy during Mr. Wimberly's appeal of his conviction in this case, when his then appellate attorney,

13   Nikki Mundkowsky, requested to review the file.

14        " In short, I am not sure why the defendant now alleges that these statements were suppressed,

15   but his claim is mistaken and unsubstantiated.

16            **"Further affiant saith not."**



                                            Paul R. McWilliams, Affiant


        **SWORN AND SUBSCRIBED** to before me the undersigned authority on this the

_12th_ day of July, 2007.

KAREN SCHUBERT
Notary Public - State of Texas
Commission Expires: 07/12/08
SEAL

                                **NOTARY PUBLIC IN AND FOR**
                                **THE STATE OF TEXAS**

                                        2

# Bell County DA's office sees major personnel changes

**BY DEBORAH MCKEON**
EME NEWS SERVICE

BELTON — Major changes have been made in recent months in the Bell County District Attorney's office. Paul and Leslie McWilliams retired from their assistant district attorney jobs.

Stephanie Newell replaced Paul McWilliams as the first assistant district attorney. Jamie Decker is a new assistant district attorney, and Anthony Smith is moving to the McLennan County District Attorney's office.

These are some of the turnovers in the District Attorney's office. Others have not yet been announced.

"Stephanie Newell, a seasoned prosecutor with my office, is my new first assistant district attorney," District Attorney Henry Garza said Friday.

Garza said he believes Newell is the first woman to hold the first assistant district attorney spot in Bell County's history. Newell brings leadership and tenacity of focus to the position, and those qualities are the ones Garza

**PLEASE SEE CHANGES, A8**

# CHANGES

**FROM PAGE A1**

sought in first assistant district attorney, he said.

She has been an assistant district attorney with Garza's office since 2005 and has held many board positions within the community including the Bell County Bar Association, the Bell County Women's Bar Association, the Bell County Young Lawyers Association and the Children's Advocacy Center of Central Texas. She has been recognized for her hard work and leadership and was awarded the Texas Tech School of Law Bob Black Bar Leaders' Award and the Bell County Women's Bar Association Attorney of the Year in 2018.

At least two of the changes in the DA's office could influence one future case.

The McWilliams, who are married, were the attorneys for the prosecution during the George Powell robbery trial in 2009.

The Texas Supreme Court, when it reviewed the Powell conviction, found the husband and wife labored to keep information from the defense team that might have proven Powell innocent. They also promoted perjury in Demetric Smith's testimony, the court said, and rewarded him afterward by making it possible he served no time in prison.

Garza previously said he does not discuss personnel issues, and he didn't mention anything about the McWilliams' part in the Powell case.

# EXHIBIT

## [ 4 ]

**ATTORNEY JON JON MCDURMITT LETTER**

**DATED JUNE 05, 2003**

**OUTLINES STATE'S CASE:**

# CARROLL AND MCDURMITT

### Attorneys and Counselors at Law
### 200 East Central Ave.
### Belton, Texas 76513

Rusty Carroll*

Jon Jon McDurmitt

6/5/3

DEAR MR WIMBERLY

ENCLOSED ARE THE following, copy of indictment 54705, police report, photo line up (your #2 of course)

I AM advised that witnesses from pizza for the state should be

MR. GIOIOSO (Gee-o-so)
MR BALES
MR. CASTRO
MR WYNN
MR SAWCHAK
MR RODRIGUEZ

GIOIOSO - is expected to describe the robber as 6'+, 30yr+, 200 lbs+ needing a shave, dark clothes, hooded jacket, shotgun, gloves

WYNN - the same plus his comments re shotgun in his chest.

others - the same

The states case rests on you being picked out of the photo line up by GIOIOSO and WYNN.

(254) 939-0845
Fax: (254) 939-8905

# EXHIBIT

[ 5 ]

Eyewitness Identification Expert Report

By

Nancy K. Steblay, Ph.D.

# Eyewitness Identification Expert Report
## Nancy K. Steblay
### *State of Texas vs. Christopher E. Wimberly*

**September 28, 2020**

**I am prepared to testify to the following points. I reserve the right to supplement this report if additional materials and new information become available.**

**Nancy K. Steblay, Ph.D.**

*Nancy K Steblay*

## Introduction

I am Nancy K. Steblay, Ph.D., Professor Emeritus of Psychology at Augsburg University in Minneapolis, Minnesota, where I have been teaching and doing research on eyewitness topics since 1988. I am an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. My research has contributed to scientific recommendations regarding procedures of collecting and documenting eyewitness identification evidence that can help to prevent mistaken eyewitness identifications. I have authored over 45 publications, including peer-reviewed research, chapters, and law review articles on topics of eyewitness memory, identification procedures in lab and field tests, police eyewitness evidence practice and policy (including lineups and showups), and jury decisions. Many of my publications involve the review of bodies of literature, a quantitative method called meta-analysis. Other publications involve the analysis of empirical data from the lab and from real witnesses to crime in the field. The National Science Foundation and the National Institute of Justice have funded my research studies on eyewitness identification evidence and police procedures. I have given workshops, information sessions, and lectures on eyewitness identification evidence to attorneys, prosecutors, police, and judges in the United States and Canada, and I have worked with prosecutors, law enforcement, and other public officials and policy makers to help reform eyewitness identification procedures. The content of my training sessions for legal professionals and law enforcement includes science-based memory principles, science-supported recommendations for conducting eyewitness interviews and identification procedures (for lineups, show-ups, and related identification practices), and current knowledge regarding the limitations of triers-of-fact in their understanding and appreciation of eyewitness science findings. I have served on the editorial boards of four major scientific journals that publish research on eyewitness identification, and I have reviewed manuscripts on eyewitness identification for 16 journals. I am the Associate Editor for the American Psychological Association journal *Psychology, Public Policy and Law*, a forum for critical evaluation of public policy and legal issues in light of the scientific knowledge base in psychology.

My curriculum vita is attached to this report.

I have been retained by Charmaine Wimberly to evaluate eyewitness identification evidence in the case of *Texas vs. Christopher E. Wimberly*.

My contract date was March 5, 2020.

## I.  Overview

This report provides a science-based explanation of why eyewitness memory can be unreliable and how a mistaken identification can occur.  The report is based on the vast reservoir of scientific knowledge that has developed largely *after* the conviction of Mr. Wimberly in 2003.

This body of research demonstrates multiple problems with the eyewitness evidence offered at Mr. Wimberly's trial.  The circumstances of the crime are consistent with what scientists now know to produce poor encoding and retention for the eyewitness memory details required for a reliable identification.  Furthermore, the procedures used to collect eyewitness evidence in this case are now recognized as likely to increase the risk of a misidentification.  My opinion, based on current scientific knowledge, is that there is a strong likelihood that the eyewitness evidence used to convict Mr. Wimberly was unreliable.

I reviewed the following documents:

| | |
|---|---|
| Incident reports | Killeen Police Department |
| Witness written statements | |
| Lineups and documentation | |
| Trial Court transcripts | October 20, 2003 |
| Evidentiary Hearing transcript | July 9, 2015 |
| Appellate Brief | June 24, 2016 |

Texas Code of Criminal Procedure Art. 38.20. Photograph and Live Lineup Identification Procedures

## II. Timeline of eyewitness events

| | |
|---|---|
| December 23, 2002 | Aggravated robbery of Pizza Hut in Killeen, Bell County, Texas. 10:44 p.m.   Six Pizza Hut employees present at robbery. Witnesses gave written statements to police. |
| January 9, 2003 (17 days after crime) | Series of photo arrays shown to Mr. Gioioso Mugshot search of approximately 126 photos One color lineup (6 photos); multiple b/w lineups (120) |
| January 2003 | Mr. Wimberly becomes a suspect from Crime-Stoppers tip |

2

| January 21, 2003<br>(1 month after crime) | Detective Ortiz met with Mr. Gioioso and Mr. Wynn at Pizza Hut.<br>Mr. Gioioso stated 80% certainty for photo #2 ("resembled")<br>Mr. Wynn stated 100% certainty for photo #2.<br>Lineup: color photos, 6 black males, Mr. Wimberly in position 2 |
|---|---|
| October 20, 2003 | Trial court case |
| July 9, 2015 | Evidentiary Hearing |
| Law enforcement: | Sergeant Kirt Yarbrough  (officer on the scene)<br>Detective Sharon Brank  (investigator, and lineup administrator on Jan 9)<br>Detective Ortiz (created lineups and administered lineup on January 21) |
| Witnesses: | Gerard Gioioso (Pizza Hut manager)  (W/M, 1968)<br>Phillip Wynn (driver) (W/M, 1955)<br>Ida Rodriguez (shift manager) (H/F, 1978)<br>David Sawchak (driver)  (W/M, 1973)<br>Jared Castro (cook, opened door for the offender)  (H/M, 1984)<br>Thomas Bales (employee, positioned at front of restaurant) (W/M, 1977) |

## III.  The development of eyewitness science since 2003.

Research from laboratory tests, field data, and legal cases now provides a sound scientific basis for understanding the experience of an eyewitness to crime, the problems that may occur with eyewitness memory for events and for offenders, and the best practices for eyewitness identification procedures that can significantly reduce the likelihood of mistaken identification.

The prestigious National Academy of Sciences (NAS, 2014) assessed the status of eyewitness research through its impartial and authoritative National Research Council.  The National Academy of Sciences membership includes top scientists, who are charged with reviewing the status of scientific research and offering recommendations for the benefit of the country.  The NAS deemed the eyewitness research conducted by scientists over the past 35 years to be sound science.  he NAS found the body of research compelling in its importance to the justice system and recommended strengthening the value of eyewitness identification evidence through police training and procedures and through scientific framework expert testimony in court on relevant precepts of eyewitness memory and identification.

The U.S. Department of Justice confirmed the science-based policies for eyewitness evidence collection in 2017. Most recently, a consensus document for nine science-based recommendations for proper collection of eyewitness evidence was published by the American Psychology and Law Society (Wells, et al., 2020). This report and its recommendations are crucially relevant to Mr. Wimberly's case, as discussed below.

3

**IV. Understanding of eyewitness memory principles by laypersons (including investigators and triers-of-fact)**

Since 2003, an ancillary line of research has addressed the issue of whether jurors already know this information. Is eyewitness science "beyond the ken" of the average person? The research reveals that jurors who hear eyewitness testimony have substantial difficulty assessing identification accuracy (Smalarz & Wells, 2015).

There are two core difficulties. First, jury members usually see a witness on the stand who is sincere, confident, and has no discernable reason to lie. Jurors do not intuitively understand how witness confidence can be inflated between the time of the identification and the courtroom testimony or how an honest and confident witness can be mistaken.

Second, the eyewitness has often selected the defendant from a police lineup; from a juror's perspective, why would the witness select the defendant (and not one of the other five lineup members) if the defendant is not guilty? Moreover, the eyewitness often makes an in-court identification of the defendant. Again, jurors do not intuitively understand how police practices and memory contamination can affect identification accuracy. The very poor understanding of jurors for the impact of biased identification procedures does not equip them to knowledgably address the fundamental question of how/why a well-intentioned eyewitness may falsely identify the police suspect.

Laypersons (as well as police, judges, and juries) tend to hold unrealistic beliefs about eyewitness memory, seemingly unaware that memory of a crime is fragmented and highly malleable across time and that a period of time beyond even 10 hours will significantly erode memory quality. Many laypersons adhere to myths about memory that have been firmly contradicted by scientific evidence and that are simply wrong. For example, science shows that witness confidence on the stand is not a reliable indicator of eyewitness accuracy, yet this is the one factor consistently used by laypersons to evaluate eyewitness evidence (Wise & Safer, 2003, 2004; Wise, Safer, & Maro, 2011; Wise, Pawlenko, Safer, & Meyer, 2009; Desmarais & Read 2011; Kovera & Levitt, 2014).

A good example of layperson knowledge is in *The Public Defender Survey*, a study of 1,000 Washington D.C. jury-eligible residents (Schmechel, O'Toole, Easterly, & Loftus, 2006). The survey required participants to consider an eyewitness scenario and select from multiple response options. For example, respondents considered whether a weapon at a crime would make the eyewitness *more reliable, less reliable, would make no difference*, or *"not-sure."*

The PDS findings: Laypersons are aware of some factors that affect eyewitness accuracy—for example, the negative impact of intoxication on memory. However, few people have a correct understanding of how memory actually works. Many wrongly believe that memory is like a video-recorder that captures and maintains pristine and complete details. A sample of **erroneous** beliefs include:

- *"... remembering a traumatic event is like a video recording in that one can recall details as if they had been imprinted or burned into one's brain."* Fifty-two percent (wrongly) believe this is true or they admit they don't know.

- Forty-two percent believe that the witness on the stand is effectively narrating a *recording of events in "mind's eye."*

- *"I never forget a face."* Sixty-six percent indicate this unlikely statement applies very or fairly well to themselves.

The survey also established the very limited knowledge of laypersons regarding how specific factors, such as weapon presence, stress, and police procedures negatively affect eyewitness accuracy. On many topics, only 3/10 gave the correct answer. Examples:

- *Lineup format.* Only 25% correctly reported that one-at-a-time presentation of lineup members is more reliable.

- *Double-blind lineup.* Only half (48%) were correct that the procedure is more reliable if the officer does not know who the suspect is.

Finally, a key finding is that only 17% of respondents correctly reported that eyewitness confidence does not equal accuracy.

The relatively modest proportion of respondents who report accurate answers about eyewitness principles indicates that understanding fails at many levels. Expert testimony based on the up-to-date body of knowledge can help the jury to consider relevant memory principles, to better understand the factors that can affect the reliability of eyewitness memory (including police procedures), to guard against mistaken "memory myths," and to apply scientific knowledge to the evaluation of eyewitness evidence.

## V. Eight case observations relevant for eyewitness science

I examined the eyewitness identification evidence in Mr. Wimberly's case, particularly the circumstances under which witnesses experienced the crime event and subsequently made identification decisions from a police lineup.

I begin with an overview of eight observations and subsequently delve into the specific scientific findings that underlie each of the eight points. A more general framework of scientific knowledge follows in Section VI.

A useful way to evaluate the reliability of a witness's report of a crime event and suspect identification is to consider three stages of the eyewitness experience: *acquisition, retention,* and *retrieval* of memory. A problem at any of these three stages is sufficient to produce an identification error. My analysis reflects what scientists know now about eyewitness memory at each of these three stages.

- *Acquisition stage.* The reliability of an identification first depends on whether the witness had a decent view of the culprit and crime and was paying attention for the time required for a memory to be formed (this memory acquisition process is also called *encoding.*).

- *Retention stage.* Images encoded into memory are not stored forever in perfect condition, but can be forgotten, revised, and or distorted with time.  Witnesses not only forget details, but also "remember" things that are not so.

- *Retrieval stage.* Memories are not so much "retrieved" as reconstructed using current knowledge.   Every time a witness revisits a memory (thinks again of the event), there is opportunity for revision and distortion.

1. The conditions of the crime event (*acquisition* of memory).

The witnesses experienced a brief, chaotic, stressful crime committed by a stranger with a gun who threatened the witnesses and forced them to the floor. The offender wore a disguise (heavy coat with a hood drawn to cover much of his face) and kept his head down. It would be difficult to encode a strong memory of a stranger under these conditions.

2. Cross-race effects in memory formation and identification.

All witnesses viewed a stranger of another race for only a brief time. Encoding of detailed facial features of the offender would be difficult, and risk for subsequent identification error is substantial.

3. The witnesses' descriptions of the offender.

Witness descriptions of the robber were general—race, gender, size, clothing.  There were reports of facial hair (beard, mustache "bunch of scrubs") and variations of age estimates (25 to mid-30s).  There is inconsistency regarding height (reported range from 5'7" to over 6').

The descriptions of the offender by the identifying witnesses (Mr. Gioioso and Mr. Wynn) are of critical importance in this case, because the lineup shown to these two witnesses must adhere to these specific descriptions. The two witnesses agree that the offender was a black man in his 30s, and Mr. Wynn reported a very dark complexion. (see point #5 below)

4. The time between crime and identification procedure (*retention* of memory).

The identifications occurred 1 month after the robbery, allowing substantial opportunities for memory loss and interference during this time.

Mr. Gioioso described the offender as looking just like the restaurant's part-time driver, thus opening the possibility for memory confusion between facial features of the two

persons, especially over a full month. Mr. Gioioso also viewed dozens of mugshots, a
task that is highly disruptive to memory. There was also opportunity for employees to
share their memories of the crime with one another (and to taint memory).

5. Biased lineup construction (*retrieval* of memory).

A fair lineup is one in which every lineup member matches the description of the
offender provided by the viewing witness. Both witnesses were looking for a black man
in his 30s, and Mr. Wynn was looking for a very dark-skinned man with dark eyes. Mr.
Wimberly is the only lineup member in his 30s, and he is one of only two lineup
members with a dark complexion.

6. The witnesses' decision-processes.

Facial recognition is holistic, automatic, and fast. Neither witness in this case made a
fast immediate recognition. Instead, they both engaged in a deliberative process of
elimination and feature-seeking that is not typical of true recognition. The process of
elimination is akin to trying to figure out the answer to a multiple-choice test question
when you do not really know the answer.

7. Confidence inflation and in-court identifications.

Both witnesses identified Mr. Wimberley in court. At 25 feet, Mr. Gioioso claimed to
recognize "his eyes" at the defense table. However, the first eyewitness identification
(the lineup) is the proper opportunity to assess memory (indeed, the only memory test
that counts). Moreover, witness confidence and accuracy are not necessarily related
when the identification is derived from biased procedure (point #5 above).

8. The police identification procedures.

This case shows substantial deficits in proper lineup construction, instructions to the
witnesses, lineup presentation, and documentation.

Police standards for best practices in collection of eyewitness evidence have evolved
since 2003. Best-practices decrease the suggestiveness of police procedures, increase
the reliability of identification evidence, and prompt full documentation of the
identification procedure for the benefit of investigators and triers of fact. When best
practices are not employed, the reliability of eyewitness evidence can be significantly
undermined.

### *Now, each of the eight observations is considered in light of scientific knowledge.*

### 1) The conditions for the witnesses to form an initial memory for the culprit were poor.

Memory is not like a video-recorder. We cannot pay attention to everything at once. The
clarity of view and the amount of attention paid to a perpetrator's facial features will have an
impact on what is brought into memory and what can subsequently be recalled.

7

Witness memories in this case stem from a dramatic, fast-moving and chaotic crime event, the armed robbery of a restaurant. The lighting conditions were good (inside the restaurant) and there was close proximity between the offender and the witnesses. However, conditions that may have limited the witnesses' ability to form and retain memory for the offender's specific facial features include the facts that the assailant was a stranger of a different race, and there was only a short exposure time to the assailant (estimated at three minutes), difficulties compounded by the fact that the offender was wearing a head covering (a hoodie cinched to cover forehead, hair and chin). The crime was extremely stressful, threatening, and involved a deadly weapon. Witnesses were ordered to lie down on the floor (Mr. Gioioso reported that he remained standing; Mr. Wynn hid in another part of the building). The movement of the robber through the restaurant and the witnesses' movements were visual "noise" that would diminish the time that any witness could maintain a view of the robber's face during this 3-minute event.

The crime action and the weapon drew the attention of the witnesses. The witnesses were able to describe the weapon quite well. Mr. Gioioso (in testimony, p. 32) kept track of the weapon, for example, noting that it was in the chest of another employee (Phillip Wynn) before the weapon was held to his own back. Mr. Gioioso reported that he only had a brief glance of the offender's face: "I never got a real good glance. Got a glance of the spot where the hood was pulled down." [Could you see his eyes?] "yes." At testimony: "it was all from behind…" except for the moment when the robber came in the back door.

Mr. Wynn was backed into the store from the rear door with the gun at his chest. Mr Wynn: "was looking at the gun and him." When the gunman moved Mr. Gioioso to the counter, Wynn hid in the cooler. Wynn reported the weapon as "a 12-gauge shotgun with a brown pump action loader and a silver ejection point." (Yarbrough report, 12.24.2002)

The two key eyewitnesses in this case were under substantial stress. Mr. Gioioso reported being "scared" (testimony, p. 33), and Mr. Wynn was treated for stress-related problems by the responders on the scene.

Relevant science:

- Encoding time (duration of the crime). Memory depends on what the witness was looking at and for how long. For facial identification, the time spent with eyes-on-the-face is critical. A statistically reliable association exists between exposure time and identification accuracy (Bornstein, Deffenbacher, Penrod, & McGorty, 2012). The exposure times tested in the lab involve seconds or minutes, similar to the brief exposures that are common to crime events. For example, Memon, Hope, and Bull (2003) exposed participants to a robber's face for 12 versus 45 seconds. At the identification task just 40 minutes later, correct identifications dropped by 58% for the shorter exposure time. Mistaken identifications were high (45%) for both groups under longer exposure, but especially for the short exposure time (85% errors).

- Facial covering or disguise. Coverings of the face (glasses, hats, masks) diminish the likelihood of a later correct identification (Shapiro & Penrod, 1986; Cutler, Penrod, & Martins, 1987; Mansour, et al., 2012).

- Attention. A witness must pay attention in order to form a memory. Some events do not draw much attention until the event is suddenly thrust upon the witness. A witness cannot pay attention to everything at the same time. Often action draws more attention than do facial or physical features (Chabris & Simons, 2010). If the crime takes place in a chaotic manner, or if there are multiple distractions for attention (e.g., culprit's face, threatening objects, co-witnesses, or other surrounding visual "noise"), attention to a single visual aspect will be diminished. As discussed at length by the National Academy of Sciences (NAS, 2014, pg. 53), attention is limited and complicated by competition from all the visual "noise" in the environment; there is far more visual material available than can be paid attention at any point in time.

- Weapon focus. One of the earliest studies of attentional focus used an eye-tracking device to find that a weapon (vs. a neutral object) during a crime drew the witness's eyes to the weapon and away from the offender's face—and significantly reduced later identification accuracy. This reliable phenomenon is referred to as a "weapon focus effect." (Fawcett, et al., 2011; Steblay, 1992).

- Stress and fear. Stress reduces the amount of information that is processed, severely restraining what can be retained and later retrieved—and thereby increasing the chance of a mistaken identification (Deffenbacher, Bornstein, Penrod, & McGorty, 2004;, Hope, et al., 2012; Valentine & Mesout, 2009). For example, Morgan, et al. (2004) found that correct identifications dropped by 35% under high-stress conditions (vs. low-stress), and errors increased by 35%.

## 2) The cross-race effect.

The inherent difficulty of encoding facial features of a stranger is exacerbated when that stranger is of a race different from one's own. Humans have learned to pay attention to facial features that help us discern between faces within our same race, but these cues do not work equally well for encoding and for recognizing faces of another race.

The offender in this case was black, the witnesses not of the same race. Research shows that identification errors increase significantly under cross-race conditions, and the cross-race effect is especially robust between black and white persons.

Relevant science:

- Cross race effect. The inherent difficulty of *encoding* a stranger's facial features plays out at the time of lineup identification when the witness is asked to *retrieve* a memory of the perpetrator's face. Witnesses are 1.56 times more likely to misidentify a stranger of a different race than a stranger of their own race (Meissner & Brigham, 2001; Brigham, Meissner, & Mitchell, 2007). This reliable finding is based on 39 studies, with 5000 participants.

- There is an interaction between cross-race bias and the duration of viewing exposure: reducing the amount of time allowed for viewing of the face significantly increases the magnitude of the bias, largely manifested as an increase in the proportion of false alarm responses to other-race faces (Meissner & Brigham, 2001).

**3) The witnesses' initial descriptions of the offender were limited.**

As might be expected given the short and chaotic nature of the event, the cross-race crime, and the constraints in view due to the offender's disguise, the witnesses' descriptions of the offender were general and somewhat inconsistent between witnesses.

Written statements from December 23 (immediately after crime):

> Mr. Gioioso: "a black man wearing a black coat with a hood…about 6 feet tall with a beard and a mustache…about 35 years old and about 200 lbs or so."

> Mr. Wynn: "a black male…wearing all dark clothing with a hood pulled over his head…looked to be in his early 30s, about 6 feet, with dark eyes…could not see his hair."

> Mr. Sawchak: "a black man in a thick black jacket…the man had a beard and was about 5'7"-5'9" tall and looked to be about 25-30."

> Ms. Rodriguez: "black male wearing all dark…I couldn't see his face…he was chunky."

> Mr. Bales: "a black male, about 6'1"

> Mr. Castro: "black male (dark) wearing a big hooded jacket."

From police incident reports, additional information:

> Mr. Wynn: "black male, 6' to 6'1", wearing a dark hood type top and black pants." Robber's skin is "very dark, … a mustache and what looked to be about a week's worth of hair growth on his face." (Officer Yarbrough incident report). Mr. Wynn reported that when he stepped outside at 10:42 p.m. a "very dark skinned black male put a shotgun in his chest." (Officer 5110165). "about 6' tall and approximately 200 lbs., in his early 30s, mustache and beard…looked like he hadn't shaved for a week.: (Officer 5110165)

> Mr. Gioioso described the offender as looking just like the restaurant's part-time driver. (Det. Brank report).

From testimony:

> Mr. Castro: the robber was over 6' tall.

Mr. Gioioso: "…black gentleman with a heavy black coat on, one of those feather coats. The hood was pulled up. And the draw string, it's a hood with a draw string…it squishes the face area and it was squished to right about there." [mouth area up to top of eyes; eyes, nose, cheeks, mouth were uncovered]. Chin "was covered". "His head was kept down, so it was sort of into the coat." The offender was 6' 200 pounds, early to mid-30s; had a mustache and some facial hair. "a few inches taller" [than the witness, at 5'9"]. "it wasn't a young kid. He had to be in his early to mid 30s." This conclusion was based on "seeing his eyes and his nose area; I just didn't think it was a young kid." "He had a mustache and I couldn't really see the whole beard. All I could see was some growth coming down the sides toward his mustache, I guess." There were no distinguishing marks or scars.

Mr Wynn: The robber had "bunch of scrubs like he had not shaved…thick facial hair." Mr. Wynn claimed that during the robbery his main focus was on the robber's eyes and he did not notice anything else specific to the robber. Wynn is 5' 9'' tall and reported that the robber was a few inches taller than him.

Mr. Wimberly at time of arrest:  6'3" 190 pounds, 35 years old

Relevant science:

- Stranger vs. known faces.  Faces that are strangers or that are only vaguely familiar from prior interactions are likely to have been encoded only superficially, without the level of detail that will lead to an accurate identification.  In general, we encode and store the "gist" of what is in view (typically size, race, gender, hair color) but we are less likely to capture detailed facial features (Bornstein, Deffenbacher, Penrod & McGorty, 2012; Memon, Hope, & Bull, 2003; Steblay, Dietrich, et al., 2011).

## 4) The length of time (1 month) between the crime and the identification procedure (retention of memory).

It is challenging for a witness to retain a memory image of a stranger over an extended period of time.  Retention across time is partially dependent on the initial strength of memory. Even if acquisition conditions are good, we often retain only the general images and forget the details over time—such as what the face of the offender actually looked like.   Memory will not improve over time.  Instead, memory is vulnerable to two processes: memory loss and memory interference.

The two witnesses had ample opportunity across time to compare memories, to speak with police, and to confer with others about the crime event and the identification process.  A trusted co-witness is a powerful source of information and misinformation.  Memory conformity—crime reports that become synchronized between co-witnesses—can occur even without witness awareness.

Information from external sources—media, co-witnesses, investigators, and new experience—will intrude upon the witness's original memory, especially if the memory is weak.   The witness's

narrative of the crime event will "smooth out" over time, with embellishment from new information and loss of original memory.

In this case, the combination of a brief view of a stranger of another race and a substantial retention time elevates the risk for mistaken identification. As noted by the NAS (p. 99), "during the retention interval, the ability to accurately identify faces of other races drops off especially quickly, relative to same-race accuracy."

Relevant science:

- The greatest loss of memory is within the first 24 hours after an event. The drop in memory for details is precipitous within the first 9 hours, and then levels off across time. Memory of the witness for the crime and perpetrator is likely to degrade very quickly (Shapiro & Penrod, 1986; Deffenbacher, Bornstein, McGorty, & Penrod, 2008). Mistaken identification is more likely as time passes. This research is based primarily on retention intervals that typically cover a few minutes to a few weeks. In one analysis of suspect identifications for real lineups, proportion of suspect IDs dropped from .66 to .34 from one week to one month of retention time (Valentine, et al., 2003).

- Memory interference. Memory of an offender may be corrupted across time as new information is learned and incorporated into the "memory experience." Each time the memory is recalled, changes are likely. As the NAS explained (p. 62): a "threat to the stability of long-term memories is, ironically, our life-long ability to learn new things. Because memory mechanisms are inherently plastic throughout life, content stored for the long term is surprisingly labile in the face of new information. Our memories are thus an ever-evolving account of our experiences."

- Memory contamination. Information from external (non-memory) sources will become a part of the witness's "memory story" especially when it can be tied into the witness's assumptions about how the event makes sense. The effects of external intrusions and suggestion are not easily separated from a person's memory of the original event (Loftus, 2005). That is, the witness often cannot discern the source of a memory detail.

- Co-witness and authority effects. Influences on memory are more likely when the sources are confident acquaintances and/or credible authority figures (Skagerberg & Wright, 2009; Hope, et al. 2008). Gabbert, et al. (2012) found that 71% of witnesses absorbed erroneous detail from discussion with co-witnesses ("memory conformity"). Interference is likely as the witness gets additional information from media, police, and co-witnesses or through other experiences.

- Proactive and retroactive interference. Witnesses can have trouble remembering crime details and faces because of experiences both *before* the crime event (e.g., a cashier who recalls the face of a customer who visited the store prior to a robbery instead of the face of the robber) and *after* the crime event (e.g., a cashier who confuses the face of a shopper who arrived after the crime with that of the robber). Correct recall of the crime can be impeded because of what was learned earlier (*proactive interference*) or later

(*retroactive interference*) (Loftus, 2005) correct recall of the crime can be disrupted by prior experience (Loftus, 2005).

- Misplaced familiarity and identity-blending. Witness exposure to suspects across multiple points in time after the crime (e.g. mugshots, lineups, courtroom, media) is problematic. Memory for the actual culprit can be clouded or even replaced with the new image/features of the suspect who is the target of the investigation, even if the suspect is innocent (Steblay, Tix, & Benson, 2013). The emotion attached to this recognition can feel very real to the witness; however, the witness is failing to discern the correct source of the recognition. People tend to more quickly forget the source of the information than the information itself (Brown, Deffenbacher, & Sturgill, 1977; Loftus, 1976; Ross, et al., 1994; Read, et al., 1990).

- The mugshot exposure effect. Witness exposure to mugshots poses a risk to memory, in that exposure to mugshots decreases subsequent identification accuracy and increases false identifications (Deffenbacher, Bornstein, & Penrod, 2006).

- Given the potential for memory interference and for forgetting, the best possibility for a correct identification is when memory is fresh and uncontaminated by outside influences. Interview and identification procedures are more likely to yield reliable results if conducted in close time proximity to the crime event. Hence, for example, an in-court ID is a product of the witness's memory from the time of the crime plus all the information that the witness has learned since as well as the inherent forgetting processes (Deffenbacher, et al. 2008).

## 5) The lineup construction (retrieval of memory).

Fair lineup construction first requires that the suspect matches the witness's description of the culprit. Second, the suspect should not stand out among lineup members on the basis of physical characteristics, photo quality, or context. The suspect should be surrounded by at least five fillers who share similar characteristics and who match the description of the offender as provided by the witness who will view the lineup.

The lineup included the following members: (details as per incident report)

    Photo 1: 23 yoa,  6'1"  240 lbs, dark complexion
    Photo 2: 35 yoa,  6'3"  220 lbs, dark complexion.  This is Mr. Wimberly.
    Photo 3: 24 yoa,  5;10" 185 lbs. medium complexion
    Photo 4: 21 yoa,  6'    170 lbs. medium complexion
    Photo 5: 24 yoa,  6'    185 lbs. medium complexion
    Photo 6: 21 yoa,  5'10" 160 lbs. medium complexion

Mr. Wimberly is the only lineup member in his 30s, and he is one of only two lineup members with a dark complexion.

Mr. Wynn described the offender as a tall, very dark-skinned black male.  He estimated the offender's age as in his 30s.   These are the characteristics he will be looking for.  Note that Mr. Wynn ultimately compared photos 1 and 2, to make a decision.  These are the two lineup members with dark complexions.

The presentation of photos in a simultaneous display allowed the witnesses to compare photos side-by-side, ruling out photos that did not fit the description from this biased lineup.

Using a process of comparison and elimination, the witness can choose a photo that is "closest" to memory (or description) even in the absence of true recognition. This is called relative judgment. The danger to an innocent suspect who looks most like the culprit/description is significantly increased when a witness uses relative judgment or a process of elimination.

Furthermore, a lineup in which fillers can easily be dismissed by the witness is likely to push up witness confidence for the selected photo, even if that photo is not the culprit.

>    Relevant science

- A fair lineup includes only one suspect among a set of known innocent fillers.  All lineup members must match the description of the culprit provided by the witness. Fillers protect an innocent suspect by drawing guesses and erroneous positive identifications away from the suspect. The suspect should not stand out as distinctively different from the other lineup members (Wells, et al. 2020).

## 6) The decision-making process (processes of elimination and relative judgment).

The best indicator of reliable recognition is the witness's first response to a suspect's photo during an identification procedure. True facial recognition is automatic and fast.  Neither witness in this case made a fast immediate recognition.

Instead, the witnesses' responses to the lineup indicated deliberative processes, as discussed above. Deliberative processes involve comparing photos, finding the "closest" to memory, a process of elimination, and/or focusing on one feature that resembled the offender.

Mr Wynn: "I used a process of elimination, I knew it wasn't the three bottom pictures."  He used his hands to cover up the top portion of the heads (for #1 and #2). "And this guy here was sticking out to me." (testimony)

Mr. Gioioso could only note that Photo #2 (Mr. Wimberly) "resembled" the offender. He was only 80% sure.

Both witnesses folded the photos, so that only the eye region of the face could be seen. In other words, they finalized their identification with a single generic feature.

14

The difficulty of remembering a face under circumstances of a brief stressful encounter is underscored by the responses of other witnesses to the crime. Four of the six witnesses were not able to provide an identification. Mr. Sawchak was later shown three photographs to review concerning the robbery (WRR 104, 111-112). He judged the picture of Mr. Tones as the greatest likeness to the robber based on his eyes and facial hair (WRR 105). The picture of Wimberly did not match his memory of the robber based on facial hair, eyes, and height (WRR 105-106).

Relevant science.

- Humans recognize the configuration of a face (holistic) rather than a set of individual features. That is, recognition is based on overall appearance of a lineup photo rather than specific features that seem familiar (Bornstein, et al., 2012; Wells & Hasel, 2007). Lab eyewitnesses who make accurate identifications report having engaged in automatic processes ("I just recognized him, I cannot explain why" "His face just popped out") compared to inaccurate witnesses, who report more deliberative processes (Kneller, Memon, & Stevenage, 2001; Lindsay & Bellinger, 1999). This same principle is apparent in recent analyses of eyewitness decisions from field (real) police lineups (Steblay, 2020).

- Witness identification decision time ("response latency") is related to identification accuracy. Although a specific decision time cutoff has not been determined, there is a robust research literature to indicate that accurate identification decisions tend to be made more quickly (e.g., 10-12 seconds). The reasoning is that recognition happens automatically and fast; a slower deliberative process is less likely to be based on a strong memory and therefore to produce more errors (Dunning & Stern, 1994; Wells, Memon, & Penrod, 2006).

- A non-identification should not be considered simply a "non-event" or dismissed as merely a failure to make an identification. Non- identifications can offer exculpatory information regarding the suspect as well as evidence of unreliable witness memory (Wells, Yang, & Smalarz, 2015).

- A large body of scientific research demonstrates that sequential lineups, in which a witness views lineup members one at a time and makes a judgment about each face as it is presented, is generally superior to simultaneous lineups (lineup members viewed side-by-side). The sequential lineup can cut the rate of false identification in half (Steblay, Dysart, & Wells, 2011).

  The dominant explanation for this difference is that witnesses who view simultaneous lineups can easily engage in a relative judgment process, that is choose the lineup member who most closely resembles their memory for the perpetrator relative to the other lineup members. If the culprit is not in the lineup, this process results in an identification error (Wells, 1993; Steblay, Wells, & Dysart, 2011).

**7) Confidence inflation and in-court IDs.**

15

A witness's confidence at trial (such as an in-court ID) is not necessarily a good indicator of witness memory accuracy. This is because events subsequent to the identification (police feedback, media, the charging of the suspect, etc.) will increase the witness's confidence in their ID decision. Moreover, these external influences can distort the witness's retrospective memory about details such as how much attention was paid to the event and the quality of the view of the offender's facial features.

Witnesses are usually unaware of how their memory has changed over time or what has influenced their reports and their confidence. They are not able to separate out what they knew at the time of the crime from what they learned or surmised from external sources. Once confidence is tainted, triers-of-fact are unable to discern between accurate and inaccurate witness testimony. Confident witnesses are very compelling on the stand because witnesses truly believe what they are saying (Smalarz & Wells, 2014).

If witness confidence is to be a useful indicator of accuracy, two conditions must hold: the confidence must be measured at the time of the first identification procedure, and the identification procedure must be pristine, that is, non-biased (Wixted & Wells, 2017).

In short, the *first* eyewitness identification attempt is the one that counts, whether the witness makes a positive identification or not, and an identification *must* have been conducted with an unbiased fair procedure.

Both witnesses identified Mr. Wimberly in court (October 2003). However, this in-court identification is not particularly meaningful and may be distorted by the narrative that a witness has constructed over time. For example, at 25 feet away, Mr. Gioioso recognized "his eyes" at the defense table. "I believe his eyes drew me to him."

Relevant science:

- *The "post-identification feedback effect"* is one of the most dramatic and well-supported eyewitness memory principles. Simply put, witnesses who are given feedback from authorities about the identity of the culprit ("that's the guy") display significantly inflated confidence about their identification of the suspect and in their retrospective memory of how good their view and attention to the culprit was at the time of the crime. This confidence and memory inflation is present even if their identification is wrong (Steblay, et al., 2014). Of course, eyewitness evidence must be based only on the witness' original experience, not on what was learned later on (Smalarz & Wells, 2015; Steblay, et al., 2014).

## 8) The identification procedure did not meet currently-known standards for proper collection of eyewitness evidence.

The lineup was presented by detectives who knew who the suspect was (a non-blind lineup), using a simultaneous (side-by-side) presentation of photos. There was no cautionary instruction that the offender may or may not be in the lineup. We now know from eyewitness science that

16

this very combination of procedural deficits produces a greater likelihood of suspect identification even when the suspect is innocent (Kovera & Evelo, 2017).

The State of Texas has science-based policies for collection of eyewitness evidence (*citations in italics below*).   As per the Texas Code of Criminal Procedure Article 38.20, a police agency must be based on credible field, academic, or laboratory research on eyewitness memory...and include best practices.

### *(a) Lineup structure.*

*"procedures for selecting photograph and live lineup filler photographs or participants to ensure that the photographs or participants: (i) are consistent in appearance with the description of the alleged perpetrator;  and (ii)  do not make the suspect noticeably stand out;*

As noted above (#5), the lineup was poorly constructed.

### *(b) Lineup instruction.*

*"instructions given to a witness before conducting a photograph or live lineup identification procedure that must include a statement that the person who committed the offense may or may not be present in the procedure. "*

According to testimony by Det. Brank (pg. 22), her procedure for administering lineups on January 9 included the following instruction: "I'm going to show you a picture of six males. I want you to look at the photograph and tell me if you see the person who came in your store that night."

Mr. Gioioso (testimony, p. 47) was instructed by Det. Ortiz that "he wanted me to look at more photos." Mr. Gioioso responded to a question that had the officer told you for sure that the suspect was in the lineup, he would have been 100% sure, rather than 80%. Mr. Gioioso's comment illustrates the inflated confidence that can stem from an expectation that the police have the suspect in custody.  However, he had seen dozens of photos prior to this lineup; he had the experience of viewing lineups with no expectation that the suspect was in a specific array.

On the other hand, Mr. Wynn had only this one lineup experience.  He arrived at a decision with 100% confidence; we do not know his level of expectation regarding whether the police had a viable suspect or whether this would be his only opportunity to make an identification.

The instruction given to Mr. Wynn by Det. Ortiz was the following (according to testimony of Det. Ortiz, p. 99): "I tell them basically this is a photo lineup. I've got some pictures I want to show you and if you see the person that committed whatever crime you are a victim of, to let me know and that **I need them to be 100% sure** if they do identify the person in the photo lineup."

Det. Ortiz is providing only two options:  Make an ID with 100% certainty or make no ID.

Relevant science:

- Eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. Failure to provide this instruction implies to the witness that the perpetrator is in the array and that the task is to find him. This mindset encourages the witness to make a selection from the array even in the absence of recognition memory, and a "best guess" places an innocent suspect at risk when the guilty party is not in the lineup (Steblay, 1997; 2013).

### (c) Lineup administration.

*"for a photograph identification procedure, procedures for assigning an administrator who is capable of administering a photograph array in a blind manner or in a manner consistent with other proven or supported best practices designed to prevent opportunities to influence the witness"*

Two types of administrator bias (influence) must be avoided: (1) influence that leads the witness to a specific suspect (suspect-bias) and (2) influence that prompts the witness to pick *someone* from the lineup (choosing-bias). The lineup administrator in this case was not blind.

Relevant science:

- Research has clearly demonstrated the impact on witness identification decisions of an administrator's verbal and non-verbal behavior. These influences are often subtle, unintentional, well-meaning, but deceptively powerful because they appear at face-value to be innocent or helpful (Greathouse & Kovera, 2009).

- Importantly, recent research indicates that seemingly helpful comments from a lineup administrator, such as "take your time," or "Does anyone else look familiar?" can induce the witness to choose, increase error and inflate confidence even in wrong decisions (Clark, et al. 2013; Eisen, et al, 2018).

- Witnesses are typically unaware of this influence. The witness feels as if he/she made the identification decision, but the lineup administrator has in fact steered the witness to that decision. And, this witness who testifies on the stand appears sincere and confident to triers-of-fact, even when the witness is wrong (Smalarz & Wells, 2015).

- Influences on memory are more likely when the sources are confident acquaintances and/or authority figures of credibility (Skagerberg & Wright, 2009; Loftus, 2005).

### (d) Sequential presentation.

*"any other procedures or best practices supported by credible research or commonly accepted as a means to reduce erroneous eyewitness identifications and to enhance the objectivity and reliability of eyewitness identifications."*

Texas policy does not specifically prescribe a sequential lineup procedure. Detective Ortiz commented in recent testimony (VI-142) that current practice does prescribe the sequential procedure. It is worth emphasizing that a sequential procedure significantly reduces the risk of misidentification that might be incurred by guessing. It also minimizes the risk that a witness with a weak memory will engage in comparison of photos, a process of elimination, or relative judgment to choose the lineup member who is *closest* to memory, rather than making an absolute judgment of recognition.

A principle benefit of the sequential (one-at-a-time) procedure is to allow investigators (and triers-of-fact) to see how the witness responded to the suspect's photo alone, without comparing it to other photos. For just this explicit purpose, the sequential procedure requires that for each photo, the witness must voice a decision (yes, not, or not-sure) before moving on to the next photo.

Furthermore, recent field evidence indicates that a sequential lineup procedure may tamp down the effects of a biased lineup structure (Steblay & Wells, 2020). The reason is that the witness is not allowed to compare photos side-by-side, therefore reducing the relative judgment process.

Relevant science:

- A large body of scientific research demonstrates that sequential lineups, in which a witness views lineup members one at a time and makes a judgment about each face as it is presented, is generally superior to simultaneous lineups. The sequential lineup can cut the rate of false identification in half (Steblay, Dysart, & Wells, 2011).

- The dominant explanation for this difference is that witnesses who view simultaneous lineups can easily engage in a relative judgment process—to choose the lineup member who most closely resembles their memory for the perpetrator relative to the other lineup members. If the culprit is not in the lineup, this process results in an identification error Wells, 1993).

- Sequential lineups should be back-loaded (the witness unaware of how many photos are to be seen), so as to reduce guessing and identification errors (Horry, Palmer, & Brewer, 2012).

### (e) Immediate confidence statement

*"A witness who makes an identification based on a photograph or live lineup identification procedure shall be asked immediately after the procedure to state, in the witness's own words, how confident the witness is in making the identification."*

In this case, the lineup administrators documented the witnesses' confidence.

### (f) Documentation.

*"any other procedures or best practices supported by credible research or commonly accepted as a means to reduce erroneous eyewitness identifications and to enhance the objectivity and reliability of eyewitness identifications."*

The Texas policy does not specify audio-visual documentation for eyewitness evidence collection. Scientists do recommend a fully recorded interview that captures police conversation with the witness prior to, during, and after the lineup. The reason is that even a simple police comment upfront such as "we have the guy" is a powerful suggestion to the witness that he should make a selection from the lineup. Similarly, police conversation with the witnesses after the lineup can alter confidence and memory (the post-identification feedback effect, discussed above).

Comments and verbal exchanges can indicate witness indecision, qualifiers to the decision, or investigator influence. Proper documentation in real time can illuminate how the witness arrived at their statement of certainty and time elapsed during the lineup procedure.

The failure to fully document the procedure—absence of a transcript, audio or video record of the verbal exchange during the lineup procedure—does not meet current best practices. This failure also makes it difficult to fully evaluate the quality of the identification results.

> Relevant science:

- Scientists recommend that all interviews with witnesses be video-recorded (Wells, et al. 2020). An objective record of the interview will allow both investigators and fact finders the opportunity to review the information provided the witness and evaluate its evidential value. Importantly, studies suggest that investigators fail to accurately record or recall key details of statements provided in interviews (Kassin, Kukucka, Lawson, & DeCarlo, 2017; Lamb, Orbach, Sternberg, Hershkowitz, & Horowitz, 2000); thus, recording the interview with a witness provides an objective record of the information elicited, absent omissions or errors that may be introduced via the investigators' recollection of the interview.

## VI.  General principles: the science of eyewitness memory

The following is a general introduction to eyewitness research principles, with some repetition of the science discussed above. The large body of scientific findings since Mr. Wimberly's conviction in 2003 provides new evidence and understanding regarding the factors that lead to unreliable eyewitness identification.

[Note: In this report, the term *lineup* refers to both photo arrays and live (physical) lineups.]

### *Memory is malleable; eyewitness memory can be unreliable.*

Controlled laboratory and field studies have established that eyewitness memory is often mistaken (*see, e.g.*, Steblay, Dysart, & Wells, 2011; Wells, Steblay, & Dysart, 2015). Even a

very confident and well-intentioned eyewitness can misremember and misreport the events of a crime scene and who was involved. Memory is not like a video recorder. Instead, our memory of an event or a person is very malleable (can easily change) and is often unreliable (Loftus, 2005).

Recent analyses of field data indicate that real eyewitnesses to crime in real investigations make identification errors at a strikingly high rate (Wixted & Wells, 2017). Of witnesses who chose from lineups, 1 in 3 made a mistaken identification (a filler pick, which is a known error). One reason for this may be that witnesses, even those with only vague or poor memories, feel pressure to make a positive identification to help the investigation.

*Many factors can lead to mistaken identifications.*

There is no single rate of mistaken identifications. Instead, the likelihood of mistaken identification depends on a number of factors that include conditions of the *crime* (*e.g.*, witness view, duration of event, illumination, presence of a weapon), factors related to the *witness* (*e.g.*, stress, attention, visual acuity), and attributes of the *perpetrator* (*e.g.*, disguise or head/facial cover, prior relationship between witness and offender, distinctive appearance). After the crime, the memory of the witness for the crime and perpetrator is likely to degrade very quickly and to change as the witness gets additional information from media, police, co-witnesses or through other experiences. Finally, the police procedures used to interview the witness and secure an identification (*e.g.*, mugshots, composites, show-ups, lineups, in-court ID) and the timing of such procedures may affect the quality of the eyewitness memory evidence (*see*, in general, Steblay, 2015).

*Problems in the eyewitness memory process*

A useful way to evaluate the reliability of a suspect identification is to consider three stages of the eyewitness memory experience: *acquisition*, *retention*, and *retrieval*. A problem at any of these three stages is sufficient to make memory fail. Relevant factors in this case are listed below (*see* Steblay, 2015).

1. *Acquisition stage.* The reliability of an identification first depends on whether the witness had a decent view of the culprit and was paying attention for the time required for a memory to be formed (this memory acquisition process is also called *encoding*).

- **Attention:** A witness must first be able to see and pay attention in order to form a memory. A witness cannot pay attention to everything at the same time, nor is everything in visual range. Often action draws more attention than do facial or physical features (Chabris & Simons, 2010).

- **Complexity:** If the crime takes place quickly or in a chaotic manner, or if there are multiple distractions for attention, the witness is likely to encode only some basic and limited aspects of the event and perpetrator (*see*, in general, Steblay, 2015).

- **Weapon-focus:** The presence of a threatening weapon draws the witness's attention to that weapon and away from the perpetrator's face. Memory for the offender is less likely available for identification when a crime involves a weapon (Steblay, 1992; Fawcett, Russell, Peace, and Christie, 2011).

- **Encoding time (duration of the crime):** Memory depends on what the witness was looking at and for how long. For facial identification, the time spent with eyes-on-the-face is critical (Bornstein, B.H., Deffenbacher, K.A., Penrod, S.D., & McGorty, E.K., 2012).

- **Stranger vs. known faces:** Faces that are strangers or that are only vaguely familiar from prior interactions are likely to have been encoded only superficially, without the level of detail that will lead to an accurate identification. In general, we encode and store the "gist" of what is in view (typically size, race, gender, hair color) but we are less likely to capture detailed facial features (Steblay, Dietrich, et al., 2011).

- **Stress and fear:** Stress reduces the amount of information that is processed, thereby severely restraining what can be retained and later retrieved—and thereby increasing the chance of a mistaken identification (Deffenbacher, Bornstein, Penrod, & McGorty, 2004; Morgan, et al., 2004, Hope, et al., 2012; Valentine & Mesout, 2009).

- **Distinctive features:** Features such as a tattoo, unusual hairstyle, or highly-visible scar, may draw attention. Non-distinctive faces are more difficult to encode for later identification (Bornstein, Deffenbacher, Penrod & McGorty, 2012; Memon, Hope, & Bull, 2003).

- **Facial covering:** Coverings of the upper face (glasses, hats, masks) diminish the likelihood of a later correct identification (Shapiro & Penrod, 1986; Cutler, Penrod, & Martins, 1987; Mansour, et al, 2012).

- **Cross race effect.** The inherent difficulty of *encoding* a stranger's facial features plays out at the time of lineup identification when the witness is asked to *retrieve* a memory of the perpetrator's face. Witnesses are 1.56 times more likely to misidentify a stranger of a different race than a stranger of their own race (Meissner & Brigham, 2001; Brigham, Meissner, & Mitchell, 2007). This reliable finding is based on 39 studies, with 5000 participants.

*2. Retention stage.* Information encoded into memory at the time of the crime is not stored forever in pristine condition. Rather, memory is fragmentary, and memory traces can be forgotten, revised, and distorted with time.

- **Retention interval:** The greatest loss of memory is within the first 24 hours after an event. The drop in memory for details (faces) is precipitous within the first 9 hours, and then levels off across time. The memory of the witness for the crime

22

and perpetrator is likely to degrade very quickly and to change as the witness gets additional information from media, police, and co-witnesses or through other experiences (Shapiro & Penrod, 1986; Deffenbacher, Bornstein, McGorty, & Penrod, 2008).

Even if acquisition conditions are good, we often retain only the gist and forget the details over time—such as what the face of the offender actually looked like. Therefore, mistaken identification is more likely as time passes. This research is based primarily on retention intervals that typically cover a few minutes to a few weeks. In one analysis of suspect identifications for real lineups, proportion of suspect IDs dropped from .66 to .34 from one week to one month (Valentine, et al., 2003).

The retention of a facial memory across time is partially dependent on the initial strength of memory. A poor memory of the face at initial encoding dictates that memory loss only gets worse from that point. Memory will not improve over time.

- **Memory reconstruction and misinformation effects:** Research demonstrates that witnesses not only forget details, but that they also "remember" things that are not so. Witnesses have a strong motivation to develop a narrative of what happened and who is responsible. But memory may be incomplete. Witnesses fill in the gaps of memory with what "must be so," what makes sense to the witness (Bornstein, et al., 2012; Skagerberg & Wright, 2008).

- **Memory contamination and memory conformity:** Witnesses fill in their gaps in memory or even change memory based on what they learn from other sources— from other witnesses, media, and police. Even subtle exposure to incorrect information can alter witness recall for events and faces. Influences on memory are more likely when the sources are confident acquaintances and/or authority figures of credibility (Skagerberg & Wright, 2009; Loftus, 2005).

*3. Retrieval stage.* Memories are not so much "retrieved" as reconstructed using current knowledge.

- Information from external (non-memory) sources can become a part of the witness's "memory story," as it is tied into the witness's assumptions about how the event makes sense (Loftus, 2005). Each time the "memory" is recalled, changes are likely.

- The effects of external intrusions and suggestion cannot easily be separated from a person's memory of the original event.

- Witness confidence and retrospective memory of the event (*e.g.*, attention paid to the offender's face and quality of the view) can be reconstructed and inflated between the time of the event and subsequent testimony (Steblay, Wells, & Douglass, 2014).

23

- Witness confidence and accuracy are not necessarily related, unless measured at the time of first identification under pristine identification conditions (Sporer, et. al., 1995; Wixted & Wells, 2017).

- Witness identification decision time ("response latency") is related to identification accuracy. Although a specific decision time cutoff has not been determined, there is a robust research literature to indicate that accurate identification decisions tend to be made more quickly. The reasoning offered for this finding is that recognition happens automatically and fast; a slower deliberative process is less likely to be based on a strong memory and therefore more likely to produce errors (Wells, Memon, & Penrod, 2006).

- Misplaced familiarity and identity-blending. Early memory research established that people tend to more quickly forget the source of the information than the information itself (Brown, Deffenbacher, & Sturgill, 1977; Loftus, 1976; Ross, et al., 1994; Read, et al., 1990). This finding has relevance to scenarios in which eyewitnesses are exposed multiple times to the same suspect. Indeed, more recent research has now confirmed that witness exposure to suspects across multiple points in time after the crime (*e.g.*, mugshots, lineups, court room, media) is problematic. Memory for the actual culprit can be clouded or even replaced with the new image/features of the suspect who is the target of the investigation, even if the suspect is innocent (Steblay, Tix, & Benson, 2013). The emotion and confidence attached to this false recognition can feel very real to the witness; however, the witness is failing to discern the correct source of the recognition (Steblay & Dysart, 2016).

*Best practices for identification evidence collection should be followed*

A police lineup is inherently dangerous for an innocent suspect. Eyewitnesses have a very difficult time recognizing when the guilty culprit is not in the lineup, that is, when the police have a suspect but the suspect is not the actual guilty offender. When the eyewitness cannot immediately recognize a lineup member, the witness may subsequently make a lineup selection based not on recognition of a culprit but on a process of elimination and a determination of which member is *closest* to memory. When the true culprit is not in the lineup, the result can be a false identification of the innocent suspect. The likelihood of false identification is elevated when the witness's memory for the culprit is limited or poor and/or when police identification procedures are suggestive and biased against a suspect (see Wells, Memon, & Penrod, 2006).

Best-practice guidelines aim to decrease the suggestiveness of police procedures, to increase the reliability of identification evidence, and to prompt full documentation of the identification procedure for the benefit of investigators and triers of fact. When best practices are not employed, the reliability of eyewitness evidence can be significantly undermined. Failure to document the procedure may substantially inhibit the effective evaluation of identification evidence. For example, evaluators need to determine how quickly the decision was made and whether comments from the lineup administrator may have led the witness to a decision; the comments made by an

24

eyewitness *during the lineup procedure* (qualifiers and confidence statement) can reveal decision processes (automatic recognition versus qualified deliberation).

The primary features of a good lineup procedure are that a lineup—photo or live—must have *only one suspect*; there should be at least five viable *fillers* for every suspect (who match the description of the culprit); the suspect should not stand out in the lineup; witnesses should be warned that the perpetrator *may or may not be in the lineup* and that they do not have to make a pick; lineup administrators should avoid influencing the witness (a *double-blind* procedure should be used); comparison between photos should not be allowed (*sequential presentation* of photos is necessary) and a *clear statement of certainty* should be taken at the time of the identification. Multiple presentations of the same suspect to a witness should be avoided and full documentation of the lineup procedure and outcomes is required.

- *Lineup construction.* A fair lineup includes only one suspect among a set of known innocent fillers. All lineup members must match the description of the culprit provided by the witness. Fillers protect an innocent suspect by drawing guesses and erroneous positive identifications away from the suspect. The suspect should not stand out as distinctively different from the other lineup members (Wells, Rydell, & Seelau, 1993).

- *Double-blind lineup.* Legally, the courts assume that eyewitness memory is the result of the witnessed event, not extra-legal influences. If information is conveyed by the lineup administrator, eyewitness evidence is tainted.

  The police officer conducting the lineup should not know who the suspect is—a "double-blind" procedure. This eliminates the possibility that the officer's knowledge of the suspect's identity can influence the eyewitness's decision or the officer's reporting of the lineup outcome. There is no need to assume that the lineup administrator's influence is conscious or deliberate; influence happens even without awareness. Non-blind lineup administrators are more likely to pressure a witness to make a choice, without awareness of this behavior (Greathouse & Kovera, 2009). Research has established that both witnesses and administrators may be unaware of administrator influence (Garrioch & Brimacombe, 2001).

  Witnesses may take cues from the administrator's verbal and non-verbal behavior, thereby surmising which lineup member is the police suspect. Witnesses should be told that the person administering the photo-array does not know which person is the suspect, so as to discourage witnesses from inferring direction from the lineup administrator's behavior (*see, e.g.*, Greathouse & Kovera, 2009).

  When circumstances make it difficult to have a blind lineup administrator, there is a simple solution available to deliver the lineup "blinded"—using a folder-shuffle method in which the lineup administrator can hand the witness a series of shuffled folders, one at a time, and the witness can thereby respond to each photo *out of view* of the lineup administrator.

- *Lineup instructions*. Eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. Failure to provide this instruction implies to the witness that the perpetrator is in the array and that the task is to find him. This mindset encourages the witness to make a selection from the array even in the absence of recognition memory, and a "best guess" places an innocent suspect at risk when the guilty party is not in the lineup (Steblay, 1997; 2013).

  However even with the cautionary instruction, additional comments from the detective may lead the witness to believe that the guilty culprit is surely in the lineup. The standard lineup instruction is a formal perfunctory procedure that indicates nothing about the individual witness; on the other hand, a verbal comment from a lineup administrator ("we've got the guy; we just need your ID") comes across as personal and relevant to the specific witness. The damaging effects of such comment are increased misidentifications with inflated witness confidence and willingness to testify at trial (Quinlivan et al., 2010).

- *Sequential presentation*. A large body of scientific research demonstrates that sequential lineups, in which a witness views lineup members one at a time and makes a judgment about each face as it is presented, is generally superior to simultaneous lineups (lineup members viewed side-by-side). The sequential lineup can cut the rate of false identification in half (Steblay, Dysart, & Wells, 2011).

  The dominant explanation for this difference is that witnesses who view simultaneous lineups can easily engage in a relative judgment process—to choose the lineup member who most closely resembles their memory for the perpetrator relative to the other lineup members. If the culprit is not in the lineup, this process results in an identification error (Wells, 1993).
  The proper protocol for a sequential lineup is to allow just one "lap" (viewing) of the lineup for a witness and to not allow the witness to know how many photos will be shown (Wells, Steblay, & Dysart, 2015). If the witness views the lineup a second time, the chance of error increases, as does the opportunity for the witness to use relative judgment for the decision (Steblay, et al., 2011). Hence, policies typically only allow a second viewing of the lineup and then only if the witness requests it, and documentation should reflect exactly when the identification is made. No side-by-side comparison of photos is allowed. This allows triers of fact to better judge the reliability of the witness's identification.

- *Lineup documentation*. The required written record of the lineup procedure must include the names and demographics of all individuals in the lineup, including which is the suspect and which are fillers. The record should clearly report any identification by the witness and whether the selected lineup member was the suspect or a filler. Confidence level of the witness at the time of the identification—certainty, captured in the witness's own words—must be secured at this time, because witness confidence will inflate between the time of identification and the court testimony. Failure to take a confidence statement prohibits fact-finders from

an ability to clearly discern the certainty of the witness at the time of the identification (Steblay, Wells, & Douglass, 2014).

- The danger of misidentification increases as violations of good lineup practice cumulate: In 2009, Greathouse and Kovera demonstrated how a combination of biased lineup instructions, non-blind procedure, and a simultaneous presentation of photos results in an increased level of suspect identifications—even when the suspect is innocent.

### *Early retrieval is likely to be more reliable*

Given the potential for memory interference and for forgetting, the best possibility for a correct identification is when memory is fresh and uncontaminated by outside influences. The identification procedure is more likely to yield reliable results if conducted in close time proximity to the crime event. Hence, for example, an in-court ID is problematic because it is the product of the witness's memory of the crime, the effects of forgetting, and information that the witness has learned since the time of the crime (Deffenbacher, et al. 2008).

### *Witness confidence will inflate across time*

The "post-identification feedback effect" is one of the most dramatic and well-supported eyewitness memory principles. Simply put, witnesses who are given feedback from authorities about the identity of the culprit ("that's the guy") display significantly inflated confidence about their identification of the suspect and in their retrospective memory of how good their view and attention to the culprit was at the time of the crime. This confidence and memory inflation is present even if their identification is wrong (Steblay, Wells, & Douglass, 2014).

Witnesses often become more confident about their identification and memory reports as time goes by, even if their reports are inaccurate. The reason for this is that the witness feels more confident once it is learned, for example, that his/her lineup selection was indeed the police suspect, the suspect has been arrested, there is a criminal history, or other witnesses also identified the same suspect (Smalarz & Wells, 2015; Steblay, Wells, & Douglass, 2014).

Hence, a witness' confidence at trial (such as an in-court ID) is not necessarily a good indicator of witness memory accuracy. Furthermore, witnesses are usually unaware of how their memory has changed over time or what has influenced their reports and their confidence. They are not able to separate out what they knew at the time of the crime from what they heard later on.

### *In-Court identifications reflect non-memory influences.*

In its 2014 report, the National Academy of Sciences criticized the use of an in-court identification and emphasized that it does not reliably test an eyewitness's memory due to the fact that the witness can "easily see where the defendant is sitting." (NAS, 2014). For this reason, the NAS recommended that identifications should not occur for the first time in the courtroom.

An additional problem with in-court identifications results from the witness's repeated exposure to the same suspect across identifications, tasks, or through courtroom, media, or internet views. It is difficult to separate the witness's memory for the original event from the contamination of later exposures. Some jurisdictions now are skeptical of the court's ability to disentangle the effects of suggestion and bias on memory reliability at trial (Steblay & Dysart, 2016).

A member of the NAS review committee and expert on eyewitness identification evidence, Distinguished Professor of Law at the University of Virginia Brandon Garrett, strongly advised in 2012 against in-court identifications. "There is nothing independent about the courtroom identification. Eyewitness memory is not 'independent' of prior events and courts do not have 'independent' access to the memory of an eyewitness. If the prior procedures were suggestive, then, at minimum, the courtroom identification should be per se excluded" (p. 497).


## VII. Conclusion

Eyewitness memory and identification evidence are central to this case. Scientifically-supported principles are useful to understand the possible limitations imposed on eyewitness memory by the circumstances of the crime event (e.g., cross-race effects, brief view, and divided attention), the aftermath of the event (memory loss and memory interference), poor identification procedures (violation of science-based best practices for evidence collection), and the potential for misplaced witness confidence for in-court identifications.

Eight specific areas of concern are:

1. Poor conditions for formation of memory for the offender

2. Cross-race identification

3. Witness descriptions of the offender (and subsequent lineup construction)

4. Long retention interval between the crime and the identification

5. Faulty lineup construction

6. The witnesses' decision processes

7. Witness confidence inflation and in-court identifications

8. The identification procedures

These problems—individually and in combination—increase the likelihood of mistaken identification. This case presents a very high risk that the witness identifications of Mr. Wimberly were unreliable.


## VIII. References

Bornstein, B.H., Deffenbacher, K.A., Penrod, S.D., & McGorty, E.K. (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two

variables associated with initial memory strength. *Psychology, Crime, and Law, 18*, 473-490. doi:10.1080/1068316X.2010.508458

Brigham, J. C., Bennett, L. B., Meissner, C. A., & Mitchell, T. L. (2007). The influence of race on eyewitness memory. In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol. 2. Memory for people* (p. 257–281). Lawrence Erlbaum Associates Publishers.

Brown, E., Deffenbacher, K., & Sturgill W. (1977). Memory for faces and circumstances of encounter. *Journal of Applied Psychology, 62*, 311-318. doi: 10.1037//0021

Chabris, C. F., & Simons, D.J. (2010). *The Invisible Gorilla and Other Ways Our Intuitions Deceive Us*. New York: Crown.

Charman, S.D., Wells, G.L., & Joy, S.W. (2011). The dud effect: Adding highly dissimilar foils increases confidence in lineup identifications. Law and Human Behavior, 35, 479-500. DOI 10.1007/s10979-010-9261-1

Clark, S.E., Marshall, T.E., & Rosenthal, R. (2009). Lineup administrator influences on eyewitness identification decisions. *Journal of Experimental Psychology: Applied, 15*, 63-75. doi: 10.1037/a0015185

Cutler , B.L., Penrod, S.D, & Martens, T.K. (1987). The reliability of eyewitness identification: The role of system and estimator variables, *Law and Human Behavior, 11*, 233-258. doi:10.1007/BF01044644

Deffenbacher, K.A., Bornstein, B.H., Penrod, S.D., & McGorty, E.K. (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28*, 687-706. doi:10.1007/s10979-004-0565-x

Deffenbacher, K.A., Bornstein, B.H., McGorty, E.K., & Penrod, S.D. (2008). Forgetting the once-seen face: Estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied, 14*, 139-150. doi: 10.1037/1076-898X.14.2.149.

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference. *Law and Human Behavior, 30*(3), 287–307. https://doi.org/10.1007/s10979-006-9008-1

Demarais, S.L., & Read, J.D. (2011). After 30 years, what do we know about what jurors know? A meta-analytic review of lay knowledge regarding eyewitness factors. *Law and Human Behavior, 35*, 200-210, DOI 10.1007/s10979-010-9232-6

29

Dunning, D. & Stern, L.B. (1994). Distinguishing accurate from inaccurate eyewitness identifications via inquiries about decision processes. *Journal of Personality and Social Psychology, 67*, 818-835. doi: 10.1037/0022-3514.67.5.818

Fawcett, J.M., Russell, E.J., Peace, K.A., & Christie, J. (2011). Of guns and geese: a meta-analytic review of the 'weapon focus' literature. *Psychology, Crime, and Law*, 1-32. doi:10.1080/1068316X.2011.599325

Gabbert, F., Wright, D. B., Memon, A., Skagerberg, E. M.., & Jamieson, K. (2012). Memory conformity between eyewitnesses. *Court Review: The Journal of the American Judges Association*. 382. http://digitalcommons.unl.edu/ajacourtreview/382

Garrioch, L, & Brimacombe, C.A.E. (2001). Lineup administrators' expectations: Their impact on eyewitness confidence. *Law and Human Behavior, 25*, 299-315. doi:10.1023/A:1010750028643

Garrett, B.L. (2011). *Convicting the innocent: Where criminal prosecutions go wrong*. Cambridge, MA: Harvard University Press.

Garrett, B. L. (2012). Eyewitnesses and exclusion. *Vanderbilt Law Review, 65,* 451-506.

Greathouse, S. M. & Kovera, M. B. (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70 – 82. doi:10.1007/s10979-008-9136-x

Hope, L., Lewinski, W., Dixon, J., Blocksidge, D., & Gabbert, F. (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 23*, 386-390. doi: 10.1177/0956797611431463

Hope, L., Ost, J., Gabbert, F., Healey, S., & Lenton, E. (2008). "With a little help from my friends…": The role of co-witness relationship in susceptibility to misinformation, *Acta Psychologica, 127*, 476-484. doi:10.1016/j.actpsy.2007.08.010

Horry, R., Palmer, M., & Brewer, N. (2012). Backloading in the sequential lineup prevents within-lineup criterion shifts that undermine eyewitness identification performance. *Journal of Experimental Psychology Applied 18(4).* 346-360. doi:10.1037/a0029779

Kassin, S. M., Kukucka, J., Lawson, V. Z., & DeCarlo, J. (2017). Police reports of mock suspect interrogations: A test of accuracy and perception. Law and Human Behavior, 41, 230–243. http://dx.doi.org/10.1037/ lhb0000225

Kassin, S.M., Tubb, V.A., Hosch, H.M., & Memon, A. (2001). On the "general acceptance" of eyewitness testimony research: A new survey of the experts. *American Psychologist, 56*, 405-416. doi: 10.1037//0003-.66X.56.5.405

National Academy of Sciences (2014, October 2) Identifying the culprit: Assessing eyewitness identification. National Academies Press.

Technical Working Group for Eyewitness Evidence (1999). (NIJ Guide) Eyewitness evidence : A guide for law enforcement. Washington, DC: United States Department of Justice, Office of Justice Programs.

Paterson, H.M., & Kemp, R.I. (2006). Comparing methods of encountering post-event information: the power of co-witness suggestion, *Applied Cognitive Psychology, 20,* 1083-1099. doi:10.1002/acp.1261

Quinlivan, D.S., Neuschatz, J.S., Cutler, B.L., Wells, G.L., McClung, J., & Harker, D.L. (2010). Do pre-admonition suggestions moderate the effect of unbiased lineup instructions? *Legal and Criminological Psychology, 1,* 1-12.

Read, J.D., Tollestrup, P., Hammersley, R., McFadzen, E., & Christensen, A. (1990). The unconscious transference effect: Are innocent bystanders ever misidentified? *Applied Cognitive Psychology, 4,* 3-31. doi:10.1002/acp.2350040103

Ross, D.F., Ceci, S.J., Dunning, D., & Toglia, M.P. (1994). Unconscious transference and mistaken identity: When a person misidentifies a familiar but innocent person. *Journal of Applied Psychology, 79,* 918-930.

Schmechel, R.S., O'Toole, T.P.., Easterly, C. & Loftus, E.F. 2006 Beyond the ken? Testing jurors' understanding of eyewitness reliability evidence. *Jurimetrics, 46,* 177-214.

Shapiro, P. N. & Penrod, S. D. (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139-156. doi:10.1037//0033-2909.100.2.139

Skagerberg, E.M., & Wright, D.B. (2008). The presence of co-witnesses and co-witness discussions in real eyewitnesses. *Psychology, Crime, & Law, 14,* 513-521. DOI: 10.1080/10683160801948980

Skagerberg, E.M., & Wright, D.B. (2009). Susceptibility to post-Identification feedback is affected by source credibility, *Applied Cognitive Psychology, 23,* 506-523. doi:10.1002/acp.1470

Smalarz, L. & Wells, G. L. (2014). Confirming feedback following a mistaken identification impairs memory for the culprit. *Law and Human Behavior, 38,* 283-292.

Smalarz, L., & Wells, G.L. (2015). Contamination of eyewitness self-reports and the mistaken identification problem. Current Directions in Psychological Science, 24(2) 120-124, DOI: 10.1177/0963721414554394

Sporer, S. L., Penrod, S. D., Read, J. D., & Cutler, B. L. (1995). Choosing, confidence, and accuracy: A meta-analysis of the confidence-accuracy relation in eyewitness

American Psychological Association
Association for Psychological Science
American Psychology-Law Society (APA-Division 41)

SCIENTIFIC REVIEW

| | |
|---|---|
| Associate Editor | Psychology Public Policy, and Law |
| Editorial Board member | Law and Human Behavior |
| | Applied Cognitive Psychology |
| | Psychology, Public Policy, and Law |
| | Journal of Applied Research Memory & Cognition |
| Journal manuscript review | Occasional reviews for |
| | Psychology, Crime and Law |
| | Legal and Criminological Psychology |
| | Journal of Applied Social Psychology Psychological |
| | Bulletin |
| | Journal of Experimental Criminology |
| | Journal of Experimental Psychology: Applied |
| | Current Directions in Psychological Science Perspectives |
| | on Psychological Science |
| | Journal of Criminal Justice |
| | Philosophical Psychology |
| | Psychological Science |
| | Canadian Journal of Behavioural Science |
| | Police Quarterly |
| | Journal of Police and Criminal Psychology |
| | Journal of Applied Research Memory & Cognition. |
| | Journal of Criminal Justice and Law |
| | Journal of Empirical Legal Studies |
| | Memory |
| Peer Review panel | Office of Justice Programs, U.S. Dept. of Justice |
| Grant review | National Science Foundation |
| | National Institute of Justice |
| | GWIS National Fellowship Program (UK) |
| | Graduate Scholarship Grants (Canada) |
| Conference paper review | American Psychology-Law Society |
| | SARMAC |
| | Association for Psychological Science |
| Book and chapter reviews | multiple publishers |

GRANT SUPPORT (for eyewitness memory research)

Steblay, N. (2014). NSF Grant # 1420181. "Collaborative Research: RUI: Understanding and Predicting Eyewitness Identification Errors: Studies Using a Unique Set of Materials from Actual Lineups," in collaboration with Gary L. Wells, Iowa State University.

Steblay, N. (2007) Grant # 2007-IJ-CX-0046. Reduction of False Convictions through Improved Identification Procedures: Further Refinements for Street Practice and Public Policy. National Institute of Justice.

Steblay, N. K. (2004). Grant # 2004-IJ-CX-0044. Double-Blind/Sequential Police Lineup Procedures: Toward an Integrated Laboratory & Field Practice Perspective. National Institute of Justice. Final Report published (2014) as NIJ Document # 246939. Available at https://www.ncjrs.gov/pdffiles1/nij/grants/246939.pdf

INVITED ADDRESSES/TRAININGS include: (on eyewitness memory)

Minnesota Public Defenders
Maryland Office of the Public Defender Annual Conference
Minnesota Supreme Court Evidence Committee
Webinar for Minnesota judges
New Orleans Police Department Commanders' Symposium: Best Practices in Major
    Incident Investigation to Ensure Accurate Convictions
Center for American and International Law, Plano, Texas
Minnesota Peace Officers Standards and Training Conference
Hennepin County Public Defenders Annual Conference
University of Wisconsin—Platteville Tri-State Psychology Conference
National Academy of Sciences
National Judicial Institute, Supreme Court of British Columbia
Criminal Justice Institute, Minnesota State Bar Association, Minneapolis/St. Paul, MN.
National Association of Appellate Court Attorneys, Washington, D.C.
Police Executive Research Forum, Washington, D.C.
Death Penalty Conference,  Law and Inequality Journal, University of Minnesota.
International Association of Chiefs of Police, Chicago, IL.
National Association of Criminal Defense Lawyers, Washington, D.C.
Office of the Ramsey County Attorney, St. Paul, MN
Office of the Hennepin County Attorney, Minneapolis
Minnesota Bureau of Criminal Apprehension
Minnesota County Attorneys Association
University of Cincinnati College of Law, Rosenthal Institute for Justice, Ohio Supreme
    Court Judicial Education, Columbus, OH.
Creighton University School of Law
University of Minnesota School of Law
John Jay College of Criminal Justice, New York City
University of Arkansas. Fayetteville, AR

Princeton University Woodrow Wilson School of Public and International Affairs Suburban
Peace and Police Officer Association, Minneapolis MN
California Public Defenders' Association
Washington D.C. Public Defender Service
Loyola University Chicago School of Law
Cardozo Law School, New York, NY.
Duquesne University School of Law, Pittsburgh, PA
University of Cincinnati College of Law, Cincinnati
University of Minnesota Psychology Department
Tucson Police Department
San Diego Police Department
Minnesota Public Defenders
Philadelphia Police Department
California State Sheriffs' Association
Georgia Police Accreditation Coalition
National Black Prosecutors Association
Arkansas Association of Criminal Defense Lawyers
American Society of Criminology

PROFESSIONAL CONSULTING

> Training for law enforcement & legal professionals in U.S. and Canada

> Expert testimony and consulting for legal cases (eyewitness memory and police
> procedures)

> Testimony before legislative and policy committees

SELECTED PUBLICATIONS

*REFEREED JOURNAL ARTICLES*

Steblay, N.K., & Wells, G.L. (in press). Assessment of bias in police lineups. *Psychology, Public
Policy, and Law.*

Steblay, N.K. (2018). All is not as it seems: Avoidable pitfalls in the interpretation of lineup field
data. *Psychology, Public Policy, and Law, 24,* 292-306. doi: 10.1037/law0000171

Steblay, N.K., & Dysart, J.E. (2016). Repeated eyewitness identification procedures with the
same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.
http://dx.doi.org/10.1016/j.jarmac.2016.06.010

Steblay, N.K., Dysart, J.E., & Wells, G.L. (2015). An unrepresentative sample
is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of
Experimental Criminology, 11 (2)* 295-298. doi: 10.1007/s11292-015-9233-z

Wells, G.L., Dysart, J.E., & Steblay, N.K. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology*, *11 (2)*, 285-289. doi: 10.1007/s11292-014-922-4

Wells, G.L., Steblay, N.K., & Dysart, J.E. (2015). Double-Blind Photo-Lineups Using Actual Eyewitnesses: An Experimental Test of the Sequential versus Simultaneous Lineup Procedure. *Law and Human Behavior*, *39 (1)*, 1-14.
http://dx.doi.org/10.1037/lhb0000096

Steblay, N.K., Wells, G.L., & Douglass, A.B. (2014). The eyewitness post-identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20*, 1-18. doi: 10.1037/law0000001

Steblay, N.K., Tix, R.W., & Benson, S.L. (2013). Double exposure: The effects of repeated identification lineups on eyewitness accuracy. *Applied Cognitive Psychology, 27*, 644-654. doi: 10.1002/acp.2944

Wells, G.L., Steblay, N.K., & Dysart, J.E. (2012). Eyewitness Identification Reforms: Are Suggestiveness-Induced Hits and Guesses True Hits? *Perspectives on Psychological Science, 7 (3)*, 264-271. doi: 10.1177/1745691612443368

Steblay, N.K. (2012). How I got started: Field experiments, meta-analysis, and eyewitness memory. *Applied Cognitive Psychology. 26*, 823-824. doi: 10.1002/acp

Steblay, N.K., & Phillips, J. (2011). The not-sure response option in sequential lineup practice. *Applied Cognitive Psychology*, *25*, 768.774. doi: 10.1002/acp.1755

Steblay, N.K., Dysart, J. E., & Wells, G.L. (2011). Seventy-two tests of the sequential lineup superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy, and Law, 17 (1)*, 99-139. doi: 10.1037/a0021650

Steblay, N.K. (2011). What we know now: The Evanston Illinois lineups, *Law and Human Behavior, 35, 1*, 1-12. doi: 10.1007/s10979-009-9207-7

Steblay, N.K., Dietrich, H.L., Ryan, S.L., Raczynski, J.L., & James, K.A. (2011). Sequential lineup laps and eyewitness accuracy, *Law and Human Behavior, 35*, 262-274. doi: 10.1007/s10979-010-9236-2

Steblay, N. (2008). Commentary on "Studying eyewitness investigations in the field": A look forward. *Law and Human Behavior, 32*: 11-15. doi: 10.1007/s10979-007-9105-9

Douglass, A., & Steblay, N., (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology. 20*, 859-869. doi/10.1002/acp.1237

Steblay, N., Hosch, H., Culhane, S., & McWethy, A., (2006). The impact on juror verdicts of judicial instruction to disregard inadmissible evidence: A meta-analysis. *Law and Human Behavior, 30*, 469-492. doi: 10.1007/s10979-006-9039-7

Steblay, N., Dysart, J., Fulero, S., & Lindsay, R.C.L. (2003). Eyewitness accuracy rates in police showups and lineup presentations: A Meta-Analytic Comparison. *Law and Human Behavior, 27*, 523-540. doi: 10.1023/A:1025438223608

Steblay, N., Dysart, J., Fulero, S., & Lindsay, R.C.L. (2001). Eyewitness accuracy rates in sequential and simultaneous lineup presentations: A meta-analytic review. *Law and Human Behavior, 25*, 459-473. doi:10.1023/A:1012888715007

Steblay, N.M., Besirevic, J., Fulero, S., & Jimenez-Lorente, B. (1999). The effects of pre-trial publicity on juror verdicts: A meta-analytic review. *Law and Human Behavior, 23*, 219-235. doi: 10.1023/A:1022325019080

Steblay, N.M. (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21*, 283-297. doi:10.1023/A:1024890732059

Steblay, N.M., & Bothwell, R. (1994). Evidence for hypnotically refreshed testimony: The view from the laboratory. *Law and Human Behavior, 18*, 635-652. doi: 10.1007/BF01499329

Steblay, N.M. (1992). A meta-analytic review of the weapon-focus effect. *Law and Human Behavior, 16*, 413-424. doi: 10.1007/BF02352267

Beaman, A.L., Steblay, N.M., Preston, M., & Klentz, B. (1988). Compliance as a function of elapsed time between first and second requests. *Journal of Social Psychology, 128*, 233-244. doi.org/10.1080/00224545.1988.9711367

Steblay, N.M. (1987). Helping behavior in rural and urban environments: A meta-analysis. *Psychological Bulletin, 102*, 346-356. doi.org/10.1037/0033-2909.102.3.346

Walsh, J.A., Wollersheim, J.P., Bach, P.J., Bridgwater, C.A., Klentz, B.A., & Steblay, N.M. (1985). Program evaluation as applied to the goals of a psychology department clinic. *Professional Psychology: Research and Practice, 16*, 661-670. doi.org/10.1037/0735-7028.16.5.661

Beaman, A., Cole, M., Klentz, B., Preston, M., & Steblay, N. (1983). Summary characteristics of the foot-in-the-door literature. *Psychological Documents, 13*, 6.

Beaman, A., Cole, M., Klentz, B., Preston, M., & Steblay, N. (1983). A meta-analysis of fifteen years of foot-in-the-door research. *Personality and Social Psychology Bulletin, 9*, 181-196. doi.org/10.1177/0146167283092002

BOOK CHAPTERS

Steblay, N.K. (2019). Translating psychological science into policy and practice. In *Psychology and law: An Empirical Perspective*, N. Brewer and A. Douglass (Eds.). Guilford Publications (New York).

Steblay, N.K. (2018). Scientific advances in eyewitness identification evidence. Reprinted in *Reading Innocence: A Wrongful Convictions Reader*, R. Covey & V. Beety (Eds). Durham, NC: Carolina Academic Press.

Steblay, N.K. (2015). Eyewitness memory. In *APA Handbook of Forensic Psychology, Volume 2: Criminal Investigation, Adjudication, and Sentencing Outcomes*, B. Cutler & P. Zapf (Eds.). Washington DC: American Psychological Association Press, 187-224. http://dx.doi.org/10.1037/14462-007.

Steblay, N.K. (2014). Reforming eyewitness identification: Cautionary lineup instructions; weighing the advantages and disadvantages of show-ups versus lineups. In *A Criminal Procedures Anthology: Cases, Readings, and Comparative Perspectives*, R. Mack (Ed.), p. 473. Cognella, Inc.

Steblay, N.K. (2013). Lineup Instructions. In *Reform of Eyewitness Identification Procedures*, B. Cutler (Ed.), p. 65-86, APA Press.

Steblay, N.K., & Loftus, E. F. (2012). Eyewitness memory and the legal system. In E. Shafir (Ed.) *The Behavioral Foundations of Public Policy*, p. 145-162. Princeton University Press & Russell Sage Foundation.

Steblay, N., & Loftus, E.F., (2010). Eyewitness memory. In Goldstein, E.B. (Ed.) *Encyclopedia of Perception*. Sage Reference, Sage Publications.

Steblay, N.K. (2010). Improving the Accuracy of Eyewitness Evidence. In *Inside the Minds: Adapting to New Eyewitness Identification Procedures*. Boston: Aspatore Books/ Thompson West Publishing.

Steblay, N. (2008). Eyewitness identification, field studies. In Cutler, B.L., (Ed.) *Encyclopedia of Psychology and Law*. Sage Reference, Sage Publications.

Steblay, N. (2008). Juries and inadmissible evidence. In Cutler, B.L., (Ed.) *Encyclopedia of Psychology and Law*. Sage Reference, Sage Publications.

Steblay, N., Besirevic, J., Fulero, S., & Jimenez-Lorente, B. (2007). The effects of pretrial publicity on juror verdicts: A meta-analytic review. In Roesch, R., & Gagnon, N. (Eds.) *Psychology and law: Criminal and civil perspectives*. Hampshire, UK: Ashgate.

## OTHER PUBLICATIONS

Steblay, N.K. (2016). Meta-analysis as an aid for judicial decision-making. *Court Review: the Journal of American Judges Association*.

Steblay, N.K. (2015). Scientific Advances in Eyewitness Identification Evidence. *William Mitchell Law Review*, 41 (3), 101-137.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). *A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field studies.* Des Moines, IA: American Judicature Society.

Steblay, N.K. (June, 2011). A Second Look at the Illinois Pilot Program: The Evanston Data. *The Champion*, 10-15. www.nacld.org

Steblay, N.K. (2009). Maintaining the reliability of eyewitness evidence: After the lineup. *Creighton Law Review*, 42 (4), 643-654.

Steblay, N. (2007). A little advice and much encouragement for future field lineup studies. *Promoting Effective Homicide Investigations*. Police Executive Research Forum: Washington D.C.

Klobuchar, A., Steblay, N., & Caligiuri, H. (2006). Improving eyewitness identifications: Hennepin County's Blind Sequential Lineup Pilot Project. *Cardozo Public Law, Policy & Ethics Journal, 4 (2)*, 381-413.

Steblay, N., (2006). Reforming eyewitness identification: Lineup identification instructions; weighing the advantages and disadvantages of show-ups versus lineups. *Cardozo Public Law, Policy & Ethics Journal, 4 (2)*, 341-354.

Steblay, N.M., & Beaman, A.L. (1982). Reduction of fear and arousal in dental offices using reattribution techniques. *Journal of the American Dental Association, 105*, 1006-1009.

# EXHIBIT

## [ 6 ]

Trial Transcripts Volume 4; pg- 92 thur 104

Testimony By

Detective Karl A. Ortiz

---

89

1 going out, you have to flip the lock switch to open the door.
2 He couldn't.
3    Q. So you have like a manual lock you have to turn
4 while you turn the handle on the door to push it open?
5    A. Yes, sir.
6    Q. Did he try to do that in front of you?
7    A. He tried to open the door. I didn't see if he was
8 reaching for the lock, top lock but I did see him reach for
9 the doorknob and the door didn't open.
10    Q. What did he do?
11    A. He turned toward me, pointed the gun and he said,
12 Open the door.
13    Q. Where did he point the gun?
14    A. He just pointed — not specific — he pointed it in
15 my direction.
16    Q. Did you get a good look at that big guy with the
17 shotgun?
18    A. No, I did not.
19    Q. Were you trying to look at his face at all?
20    A. No, I wasn't.
21    Q. You were pretty scared?
22    A. Yes.
23    Q. Where were you looking?
24    A. Basically down and anywhere around. I was just
25 really not looking at anything specific just basically not

---

90

1 towards the suspect.
2    Q. When he pointed that shotgun in your general
3 direction told you to open up that door, what did you do?
4    A. Proceeded to go towards the door and open it up.
5 Get it over with.
6    Q. Then what did he do?
7    A. After I opened the door, he went out the back door
8 and said stay in there and then that's when everything was
9 over.
10    Q. And you indicated that you never really got a good
11 look at his face?
12    A. Never got a good look at his face.
13    Q. Could you identify him today?
14    A. No.
15    Q. Okay.
16       MR. WALDMAN: Thank you.
17       Pass the witness.
18       MR. McDERMITT: I have no questions of Mr.
19 Castro, Your Honor. Thank you, Mr. Castro.
20       THE COURT: All right, Mr. Castro, you may step
21 down. Step outside. Wait outside. Do not discuss your
22 testimony with anyone except for the attorneys on either side
23 or here in court.
24       MR. WALDMAN: I believe Mr. Castro has to go.
25 I think he has another appointment today. Would it be okay

---

91

1 if he were excused?
2       MR. McDERMITT: No objection, Your Honor.
3       THE COURT: All right. You're excused subject
4 to recall.
5       (Witness excused)
6       MR. McWILLIAMS: Judge, I know we haven't been
7 at this very long but the State has only one more witness so
8 it might be a good time for a break because we may could talk
9 about what's in store for tomorrow.
10       THE COURT: Are you talking about breaking for
11 the day?
12       MR. McWILLIAMS: Not for the day. Just a brief
13 break so we kind of know where we're going from here.
14       THE COURT: All right. Ladies and gentlemen, I
15 guess it should be a short break here for about ten minutes
16 or so. So remember the instructions to not talk about this
17 case among each other, don't formulate any opinions about the
18 case, don't talk to anybody and I think we'll begin again in
19 probably roughly ten minutes. So we'll be in recess.
20       (Time: 3:38 p.m. to 3:51 p.m.)
21       THE COURT: Are both sides ready to proceed?
22       MR. McWILLIAMS: Yes.
23       MR. McDERMITT: Yes.
24       THE COURT: All right. Call in the jury.
25       (Jury present)

---

92

1       THE COURT: All right. Be seated please.
2       The record will reflect that the jury is again
3 present, as are the attorneys for the State, the defense and
4 the defendant.
5       State, you may call your next witness.
6       MR. WALDMAN: State calls Karl Ortiz.
7       THE COURT: Have a seat and you may proceed,
8 State.
9       MR. WALDMAN: Thank you, Your Honor.
10       KARL ORTIZ,
11 having been previously duly sworn, testified as follows:
12       DIRECT EXAMINATION
13 BY MR. WALDMAN:
14    Q. Would you please state your name.
15    A. My name is Karl Angelo Ortiz.
16    Q. And Mr. Ortiz, how are you employed?
17    A. I'm a police officer for the City of Killeen.
18    Q. And how long have you been a police officer?
19    A. About 24 years.
20    Q. Okay. You're in the detective division, correct?
21    A. Yes, sir.
22    Q. Normally detectives don't wear the standard issue
23 uniform?
24    A. That's correct.
25    Q. All right. How long have you been in the detective

---

93

1  division?

2  A. About 18 years.

3  Q. Okay. And which part of the division are you

4  assigned to? Crimes against property or crimes against

5  people?

6  A. Crimes against persons.

7  Q. Okay. And how long have you been there?

8  A. About 11 years.

9  Q. What is it that a detective in crimes against

10  persons does?

11  A. We investigate cases, we're assigned cases, we

12  investigate them, we prepare cases for screening, we conduct

13  interviews with different people, victims, suspects,

14  witnesses, conduct photo lineups, process crime scenes,

15  things of that nature.

16  Q. So you do a lot of the follow-up investigation on

17  initial reports?

18  A. Yes, sir.

19  Q. Where does those initial reports come from?

20  Citizens or other police officers?

21  A. That's correct.

22  Q. Let me draw your attention to January of 2003, were

23  you brought into an investigation that involved a robbery of

24  Pizza Hut on East Rancier?

25  A. Yes, sir.

94

1  Q. And did that robbery occur on December 23rd, 2002?

2  A. Yes, sir.

3  Q. Okay. At the time you were brought in to the

4  investigation was there any type of crime scene involved

5  here?

6  A. No, sir, not in this particular case.

7  Q. Why was that?

8  A. The report indicated that there was no crime scene

9  in the area of photographing as far as fingerprints, anything

10  with physical evidence.

11  Q. So being that there was no real crime scene for you

12  to investigate what did your efforts focus on?

13  A. We focused a lot on interviews, looking for

14  suspects, interviews with the witnesses, victims and talking

15  to possible suspects as far as interviews, photo lineups,

16  things of that nature.

17  Q. Okay. You've mentioned photo lineups twice, what is

18  a photo lineup?

19  A. A photo lineup is when I take a picture of a

20  possible suspect in an investigation. I believe that person

21  may be responsible or is a possible suspect, I'll take the

22  photograph, develop a photograph of that person and then

23  compare that — attach that with five other photos, and we

24  try to get these photos similar with the suspect, and we show

25  them to witnesses and victims.

95

1  Q. Okay. Now, the folks that you show photo lineups to

2  are those individuals who indicate they can possibly identify

3  the person?

4  A. Yes, sir.

5  Q. Okay. Now, did you prepare any such photo lineups

6  in the investigation involving the robbery of Pizza Hut?

7  A. Yes, I did.

8  Q. How many photo lineups did you prepare?

9  A. A number of them.

10  Q. Okay. Did one of the photo lineups include an

11  individual's picture by the name of Christopher —

12  Christopher Eugene Wimberly?

13  A. Yes, sir.

14  Q. And was that a color photo lineup?

15  A. Yes, sir, it was.

16  Q. And what did you do with that photo lineup?

17  A. Showed that to the employees, a couple of the

18  employees at the Pizza Hut restaurant.

19  Q. Okay. Did you have the employees of the Pizza Hut

20  restaurant come to see you at the police station or did you

21  go out there?

22  A. Depended on their schedule, sometimes they come down

23  to the police station and when they weren't available to come

24  down there, then I go down to the restaurant.

25  Q. Okay. And who specifically did you show the photo

96

1  lineup to?

2  A. Mr. Gioioso and Mr. Wynn.

3  Q. Okay. And they were two Pizza Hut employees?

4  A. Yes, sir.

5  Q. And did both those individuals indicate it was

6  possible they could identify the person?

7  A. Yes, sir.

8  MR. WALDMAN: Your Honor, we have a photo

9  identification lineup marked as State's Exhibit 12 with the

10  identifiers on the back. I believe we've previously shown

11  this to Mr. McDermitt.

12  THE COURT: You have.

13  MR. WALDMAN: We would like to show it to

14  Mr. Ortiz now and enter it into evidence.

15  MR. MCDERMITT: Your Honor, may we approach the

16  bench?

17  THE COURT: Yes.

18  (At the bench, discussion off the record)

19  MR. WALDMAN: Your Honor, if I could approach

20  the witness?

21  THE COURT: You may.

22  Q. (By Mr. Waldman) Detective Ortiz, I'm showing you

23  what's been marked as State's Exhibit 12 and is this one of

24  the photo lineups that you prepared in this case?

25  A. Yes, sir, it is.

97

1   Q. Okay. And are you familiar with the individuals in
2 that photo lineup?
3   A. Yes, sir.
4   Q. Okay. And is Christopher Wimberly in that lineup?
5   A. Yes, he is.
6   Q. And which one is he in that lineup?
7   A. He's on the top center row.
8   Q. Okay. And do you know Mr. Wimberly?
9   A. I met him.
10   Q. Okay. All right.
11     MR. WALDMAN: Your Honor, the State would offer
12 State's Exhibit 12, the photo lineup.
13     MR. MCDURMITT: Your Honor, we have no
14 objection to State's 12 as discussed at the bench.
15     THE COURT: All right. State's 12 with the
16 photographs are admitted.
17     MR. WALDMAN: Okay, thank you, Your Honor.
18   Q. (By Mr. Waldman) Detective Ortiz, who did you show
19 that lineup to first?
20   A. Mr. Gioioso first.
21   Q. Okay. And upon showing it to him was he able to
22 identify anybody on that lineup?
23   A. Not 100 percent, no, sir.
24   Q. And which person did he indicate that he could
25 identify less than 100 percent?

98

1   A. It was Mr. Wimberly's photo.
2   Q. Okay. And his photo appears in the top center of
3 that photo array?
4   A. Yes, sir.
5   Q. And then once you showed that identification — that
6 lineup to that individual did you then show it to Mr. Wynn?
7   A. Yes, sir, I did.
8   Q. Okay. And was Mr. Wynn able to identify anyone
9 within that photo array?
10   A. Yes, he did.
11   Q. And who was that?
12   A. That was Mr. Wimberly, the defendant.
13   Q. Okay. And did Mr. Wynn give any approximation of
14 the percentage of surety he had of making his identification?
15   A. Yes, sir, he did. He said he was 100 percent sure.
16   Q. Okay. Did he do anything in making the
17 identification with his hand or with the shoot, did he focus
18 on any part of the individuals in that lineup?
19   A. Yes, when I showed him the photo lineup to Mr. Wynn,
20 he said he remembered the eyes in particular. And so when he
21 was looking at the photo lineup, using his hands he covered
22 their — part of their faces up just to show that, their eyes
23 when he was doing each photo.
24   Q. Okay. Now, Detective Ortiz, what are the procedures
25 that you normally follow when you show photo lineups to

99

1 witnesses or victims? Do you tell them anything at the time?
2   A. I tell them basically this is a photo lineup. I've
3 got some pictures I want to show you and if you see the
4 person that committed whatever crime you are a victim of, to
5 let me know and that I need them to be 100 percent sure if
6 they do identify the person in the photo lineup.
7   Q. Okay. Do you at any time tell the people before
8 they have an opportunity to look at that photo lineup whether
9 or not the person who you suspect of doing something is
10 within the lineup?
11   A. No, sir.
12   Q. Why is that? Why don't you tell them that?
13   A. Because your photo lineup is tainted. When we show
14 a photo lineup or there is a procedure and policy basically
15 is to show them the photo lineup and say do you recognize the
16 person or see the person in this photo lineup that did this
17 particular, whatever crime it was in these photos and leave
18 it at that.
19   Q. And that's what you did in this case?
20   A. Yes, sir.
21   Q. With both Mr. Wynn and Mr. Gioioso?
22   A. Yes, sir.
23   Q. All right. Thank you.
24     MR. WALDMAN: Pass the witness.
25

100

1           CROSS EXAMINATION
2 BY MR. MCDURMITT:
3   Q. Detective Ortiz, you have in your career as a
4 detective with the Killeen Police Department, you have
5 investigated many, many, many robberies, haven't you?
6   A. Yes, sir.
7   Q. And done hundreds of photo lineups?
8   A. Yes, sir.
9   Q. Correct?
10   A. Yes, sir.
11   Q. Did a Detective Brank, Shannon (sic) Brank, did she
12 prepare some of those photo lineups?
13   A. No, sir. I was the one that prepared the photo
14 lineups. I asked her to show one for me as I was unavailable
15 to show one, but I prepared them myself.
16   Q. There was testimony that the total number of
17 photographs in the photo lineup sheets were over like — over
18 120, does that seem about right?
19   A. I can't say indeed the exact number. Approximate.
20 I know there's a lot of photos that were shown.
21   Q. More than a couple of dozen?
22   A. Possibly.
23   Q. Okay. And am I correct in saying that all these
24 photographs are accumulated to match generally the
25 description of the suspect given to the police by the

101

1 victims?

2 A. Normally, yes, sir. In this case, because we were

3 working a robbery detail, we had a lot of photos.

4 To go back to your question, we would show a

5 large number of photos over the time period of the robbery

6 detail and we show a lot of pictures of photos to various

7 victims because we had a lot of robberies going on at that

8 time frame, so we're using — normally you go with a basic

9 description and try to match that with your suspect and in

10 this we had a wide variety of suspects to include different

11 races for that matter.

12 Q. So you wouldn't show a photograph of a female

13 Caucasian juvenile in one of these photo lineups to the

14 employees at the Pizza Hut restaurant, would you?

15 A. That's correct.

16 Q. It would be people that match generally the

17 description that the police had been given by the employees

18 there at the restaurant?

19 A. Again, yes and no. We had a — we do up a master

20 photo lineup booklet if you will. It was a large notebook

21 with a variety of photo lineups that we prepared. And some

22 of the races were different, the ages were different, et

23 cetera because of all the number of people that we developed

24 and identified during all of these robberies. So that became

25 a master, if you will, a master photo lineup booklet that we

102

1 were showing to some of the victims. Some of them weren't

2 shown, just depending on the circumstances.

3 Q. Okay. Now, when Mr. Wynn said that's the — I don't

4 know what the exact words that were used. That's him. I'll

5 never forget those eyes. I'm 100 percent sure, positive. I

6 am 100 percent, positive, did that cause you some

7 concern when someone is that sure?

8 A. No, sir, it did not. I've had that happen before.

9 Q. When Mr. Gioioso said, I'm 80 percent sure, were you

10 more comfortable in that or more comfortable in the 100

11 percent?

12 A. About the same actually.

13 Q. Okay. There's been testimony that it was the eyes,

14 the eyes did it. Never forget those eyes. Did that give you

15 some concern?

16 A. No, sir, it did not.

17 MR. MCDURMITT: Thank you, Detective Ortiz.

18 Thank you very much.

19 Pass the witness.

20 REDIRECT EXAMINATION

21 BY MR. WALDMAN:

22 Q. The quote that he gave you was "I'm 100 percent sure

23 positive. He also told me he don't forget a man's eyes when

24 he points a shotgun to your chest." Do you recall him saying

25 that?

103

1 A. Yes, sir.

2 Q. Okay. You weren't uncomfortable with that at all,

3 sir?

4 A. No, sir.

5 Q. The individual who is in the top center of that

6 photo lineup, Christopher Eugene Wimberly, do you see him in

7 court today?

8 A. Yes, sir.

9 Q. Could you identify him for us, please?

10 A. He's the male sitting down by the wall, farthest

11 male sitting next to Mr. McDurmitt.

12 Q. And for the record could you tell us what he's

13 wearing.

14 A. Blue shirt, dark colored pants, white socks and dark

15 colored like tennis shoes.

16 MR. WALDMAN: Thank you, Your Honor. Let the

17 record reflect that the witness has identified the defendant?

18 THE COURT: It will.

19 MR. WALDMAN: Okay. Pass the witness.

20 MR. MCDURMITT: I have no further questions of

21 Detective Ortiz, Your Honor.

22 THE COURT: All right, Mr. Ortiz, you are

23 excused subject to recall and please remember the

24 instructions to not talk about the case with anyone other

25 than the attorneys for either side or here in court.

104

1 THE WITNESS: Yes, ma'am.

2 THE COURT: You may step down and wait outside.

3 (Witness excused)

4 MR. MCWILLIAMS: State would rest, Your Honor.

5 THE COURT: All right.

6 MR. MCDURMITT: Defense rests, Your Honor.

7 THE COURT: All right. Ladies and gentlemen of

8 the jury, at this time we are going to recess for the

9 evening. We will start tomorrow morning at 9:00 o'clock. I

10 will have the charge that we will read to you at that time.

11 I will read the charge, and then after the charge is read,

12 we'll have the closing argument of counsel. The State has

13 the burden so they have the right to open and to close. So

14 we'll start at 9:00 with my reading to you the Charge of the

15 Court, we'll have the closing argument of counsel, and then

16 whatever evidence has been admitted will go back with you to

17 the jury room and then you'll select one of your 12 to be

18 your foreman and you'll then begin your deliberations.

19 You're not to deliberate before then.

20 You're not to talk about this case with anybody

21 at home or at your work. You're not to think about this case

22 at all tonight, not to come to any conclusions about the case

23 because even though you've heard all the evidence, you don't

24 have the Charge of the Court which gives you the law that you

25 need to apply to the facts in the case and you don't have

Elizabeth A. Young, CSR, RPR

# EXHIBIT

## [ 3 ]

Evidentiary Hearing Transcripts

Volume One (1); pg 140 thur 143

Testimony By

Detective Karl A. Ortiz

1                    CROSS-EXAMINATION

2    BY MR. WETZEL:

3        Q    You testified during Mr. Wimberly's trial.  Do

4    you recall you were a State's witness?

5        A    Yes, sir.

6        Q    And then looking at your testimony.

7            MR. WETZEL:  Sean, I'm on volume 4 page

8    99.

9            MR. PROCTOR:  Thank you.

10        Q    (By Mr. Wetzel)  During your testimony you

11    testified that when you conducted photo spreads during

12    that period of time in 2002, 2003, you would tell a

13    witness not to identify someone unless they were a

14    hundred percent certain.

15        A    If that's what I said in my testimony in the

16    trial, I'll agree with that's what I said.  Normally

17    I'll tell somebody when I show a person a photo lineup,

18    I will tell them, I can't tell you if this person is

19    here or not who committed the robbery.  I can't tell you

20    if they are even in there or not.  All I ask that you

21    tell me do you recognize anyone in this photo lineup and

22    who would that person that you recognize, why do you

23    recognize them.  That's what I would -- that's my normal

24    protocol for showing a photo lineup.

25        Q    And how does that square with don't identify

Elizabeth A. Young, CSR, RPR

1   anybody unless you're a hundred percent certain?

2       A    I don't believe I said that.

3       Q    Pardon me?

4       A    I said I don't believe -- I don't recall

5   saying that.  I don't believe I said that.

6       Q    Mr. Gioioso -- what level of certainty did he

7   have when making the identification?

8       A    He was 80 percent sure.

9       Q    Okay.  And I believe Mr. Wynn was a hundred

10  percent sure?

11      A    He said I'll never forget those eyes.  That's

12  him.  Positive without hesitation.

13      Q    Okay.  Back when these photo spreads were

14  conducted and I think there were three sessions with

15  Mr. Gioioso, if I understand the record correctly, a

16  master, then a six pack, then a six pack.

17      A    Correct.

18      Q    And he made the ID off the second six pack?

19      A    Correct.

20      Q    Okay.

21      A    If that's the number that I remember as far as

22  the last photo lineup I showed him is when he made the

23  ID.

24      Q    At the time these, these identification

25  procedures were conducted back in 2002 and 2003, you all

OATH BEFORE A NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF BEE

    I, Royry Glenn Tones, being duly sworn, under oath says:  I am the affiant of  the foregoing statement and declare under the penalty of perjury the fore-going  statement  is  true  and  correct  and is being acknowledged before you in good faith and voluntary.

*Rory Tones*

Royry Glenn Tones, TDCJ#1237607
McConnell Unit
3001 South Emily Drive
Beeville, Texas 78102-8696

SUBSCRIBED AND SWORN TO BEFORE ME THIS __3__ DAY OF __March__, 20_14_.

_____
Signature of Notary Public
Exp 9/3/2017

STATE OF TEXAS                                  §

                                                §: AFFIDAVIT OF ROYRY GLENN TONES

COUNTY OF BEE                                   §

### UNSWORN DECLARATION

I, Royry Glenn Tones, TDCJ #1237607, Affaint, understand that any false facts stated in this affidavit will subject me to penalties for perjury. I declare (certify, verify, or state) under penalty of perjury that the facts stated in the foregoing is true and correct, as well as, offered in good faith.

Signed and executed on this the _13th_ day of _February_ 2014.

_Royry Tones_
Royry Glenn Tones, Affaint
3001 S. Emily Drive
Beevill, Texas 78102
McConnell Unit-#1237607

# EXHIBIT

[ 8 ]

BLACKFISH INVESTIGATION REPORT

AND

AFFIDAVIT OF TRIAL JUROR

RANDY STERLING

Thank you for your response! I have attached a draft affidavit for your review. Please let me know if you want me to make any edits. If this affidavit is acceptable, please provide me with your address, phone number, and date of birth so I can fill in the blanks. Once the affidavit is completed to your satisfaction, it just needs to be printed, and signed in front of a witness and a notary public.

Again, thank you for your willingness to help correct this terrible mistake.

Regards,

Daryl

**From:** Randy Sterling <r.sterling@outlook.com>
**Sent:** Monday, July 29, 2019 3:08 PM
**To:** Daryl Parker <Daryl@blackfishpi.com>
**Subject:** Re: Actual Innocence Review


After reading your attachment and if all is true, I have to agree that there could have been doubt in this case.

On 7/11/2019 9:14 AM, Daryl Parker wrote:

> Mr. Sterling,
>
> Per our conversation yesterday, please review the attachment, and contact me if you are willing to assist. Thank you!
>
> Regards,
>
> **DARYL PARKER**
> Lic. #A07282601
> (972) 402-5606
> **BLACKFISH**
> **INVESTIGATIONS**
> www.blackfishpi.com

## Daryl Parker

| | |
|---|---|
| **From:** | Daryl Parker |
| **Sent:** | Tuesday, August 27, 2019 8:41 PM |
| **To:** | 'Randy Sterling' |
| **Subject:** | RE: Actual Innocence Review |
| **Attachments:** | Affidavit of Randy Sterling.pdf |

Hi Mr. Sterling,

Apologies for the delay, I've been in trial since last Thursday. I have edited the affidavit to include the contact and identifier information you provided. Please print, and sign in the presence of a notary, with a witness (anyone over the age of 18). Then just mail the original to me at:

Daryl Parker
1301 Taylor Lane
McKinney, TX 75071

Thank you again for your help, sir. It may still be a long time before anything happens, but I will keep you informed along the way.

Regards,

Daryl

**From:** Randy Sterling <r.sterling@outlook.com>
**Sent:** Wednesday, August 21, 2019 9:35 PM
**To:** Daryl Parker <Daryl@blackfishpi.com>
**Subject:** Re: Actual Innocence Review

Mr. Parker,

I'm sorry it took so long to respond. I do have reservations about all of this.  But, I do believe there could have been reasonable doubt with this new information.

I currently reside at 21180 Wolfridge Road, Killeen, Texas, 76549 and my contact phone number is 254-289-6799. My birthday is 08/20/1961.

Please let me know if you need anything else.

Randy Sterling


On 8/1/2019 10:09 AM, Daryl Parker wrote,:

    Good Morning Mr. Sterling,

STATE OF TEXAS                )
                             )
COUNTY OF BELL               )

### AFFIDAVIT OF RANDY LEE STERLING

BEFORE ME, the undersigned authority, on this day personally appeared RANDY LEE STERLING, who under oath, stated as follows:

1) My name is RANDY LEE STERLING, and I am over eighteen (18) years of age; have never been convicted of a felony offense, and am legally competent to make this Affidavit, which is true and correct, is based on my personal knowledge, and is made voluntarily and not under duress.

2) I currently reside at 21180 Wolfridge Road, Killeen, Texas 76549, and my contact phone number is (254) 289-6799.  My birthday is 08/20/1961.

3) I am making this statement regarding my participation as a juror in the 2003 trial of Mr. Christopher Wimberly (TDCJ #01207400), who was charged and convicted of an Aggravated Robbery committed in Killeen, TX on 23 December, 2002.

4) The testimony of witnesses described a black male, wearing dark clothing, a hood/mask, and using a shotgun to intimidate employees of the Pizza Hut that was robbed.  I recall that there were some discrepancies in the description of the suspect's height, and whether or not he had a mustache.  The primary witness (an employee) positively identified Mr. Wimberly by his eyes.  Despite these discrepancies, there were no other alternative suspects to consider, and without an alibi, Mr. Wimberly was convicted.

5) I have been informed, however, that there was another man, Mr. Royry Glenn Tones (TDCJ #1237607), who was arrested prior to Mr. Wimberly's trial, also for Aggravated Robbery (5 counts), including of the same Pizza Hut.  Mr. Tones was caught in the act by police, so there was little question of his guilt .  He was later convicted and is serving a 75-year sentence for his crimes.  Mr. Tones' modus operandi in these robberies was identical to the actions for which Mr. Wimberly was convicted; a black male, wearing dark clothing, a hood/mask, and using a shotgun to intimidate employees.

6) As a juror, I was never informed, by either the prosecution or the defense, and therefore was unable to consider, that a viable alternative suspect had been arrested under circumstances that clearly showed he could have committed the robbery for which Mr. Wimberly was convicted.

7) I believe this was unfair to both Mr. Wimberly, and to the jury panel, as we were unable to objectively weigh the evidence for and against Mr. Wimberly's guilt or innocence.

1

8) I further believe that, <u>had I been presented with this information at Mr. Wimberly's trial, I would NOT have voted for his conviction.</u>

9) I further understand that Mr. Tones subsequently made a full confession, taking accountability for the robbery for which Mr. Wimberly was convicted. Mr. Tones completed a sworn affidavit on 13 February, 2014, and then affirmed his confession before a judge at an evidentiary hearing on 9 July, 2015 (Bell County Trial Court Cause No. 54705, 264th Judicial District).

10) As a juror in Mr. Wimberly's trial, I now believe that Mr. Wimberly may have been wrongfully convicted, and I support his request for a new trial.

Further Affiant sayeth not.

_____
RANDY LEE STERLING (Affiant)

_____
(Witness)

SWORN AND SUBSCRIBED TO before me on the __19th__ day of __September__, __2019__.

_____
Notary Public

CHERLIN METRA
My Notary ID # 131365075
Expires November 29, 2021

2

June 7 , 2023


Mr. Christopher E. Wimberly
#1207400-ML(048)
3001 South Emily Dr.
Beeville, Texas 78102


U.S. District Court, Western District of Texas
United States Clerk's Office
800 Franklin Ave.
Waco, Texas 76701


**RE:**    Motion to Reopen the Evidence

Dear Clerk:

        Please  find enclosed the original copy of my: PETITIONER'S
MOTION   TO REOPEN THE EVIDENCE WITH MEMORANDUM IN SUPPORT PUSUANT
TO RULE 60(b)(6), for filing with the Court.

        Your assistance on this matter is greatlyappreciated. Thank
you.

                            Sincerely,

                            Chris E. Wimberly, #1207400
                            PETITIONER



CC:

        p/file

Christopher E. Wimberly
#01207400
McConnell unit
3001 S. Emily Dr.
BEEVILLE, TX 78102





CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7020 3160 0000 8900 6790

U.S.
unit
800
Wac

RECEIVED

JUN 1 2 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK



U.S. POSTAGE PAID
PM
BEEVILLE, TX
78102
R2305M148399-10

ROC 04        76701

District Court, Western District of Texas

ed States Clerk's Office

Franklin AVE.

o, Texas  76701

DC
6/10